MADELEINE M. LANDRIEU, Judge.
|, Kenneth Barnes was indicted for two counts of first degree murder, violations of Louisiana Revised Statute 14:30. Following a jury trial, Mr. Barnes was convicted on both counts. As the jury was unable to reach a verdict on the penalty phase of the trial, the court sentenced Mr. Barnes to serve two concurrent life sentences without benefit of parole, probation, or suspension of sentence in accordance with Louisiana Code of Criminal Procedure article 905.8.
Mr. Barnes filed this appeal from his convictions raising two assignments of error: that the evidence was insufficient to sustain his convictions and that he received ineffective assistance of counsel. For the reasons that follow, we find no merit in these assignments of error. Further, we find no errors patent on the face of the record and affirm Mr. Barnes’ convictions and sentences.

FACTS

On the afternoon of April 20, 2009, Fitzgerald “Gerald” Phillips and his girlfriend, Calyisse Perkins, were found dead in an abandoned house on Broadway Street in the Gert Town area of New Orleans, each having been shot once with a .38 caliber revolver. Gerald had apparently been handcuffed when he was shot. Information law enforcement had received in the days leading up to the discovery [ 2of their bodies and evidence at the crime scene made it immediately apparent to law enforcement that the two had been murdered.
The day before he was murdered, Gerald had been babysitting for his eleven year old nephew, Patrick Thayard. At some point in the evening, Gerald took Patrick with him to visit Calyisse. When they arrived, Gerald told Patrick to go inside. After being inside playing video games in a back room for approximately thirty to forty minutes, Patrick heard someone enter the apartment. Believing it to be Gerald, Patrick called out to him, but no one answered. Then, two men Patrick did not know walked into the room where Patrick was and began searching it. Patrick later described one of the men as tall, “red,” with a low haircut and a white shirt on his hand. He described the second man as having short dreadlocks, wearing a long-sleeve blue shirt, and carrying handcuffs. Patrick did not see Gerald or Calyisse and thought they must be in the front room of the apartment. When the two men left the apartment without him seeing or hearing Gerald or Calyisse, Patrick called his grandmother, Gerald’s mother, and related the incident. Mrs. Phillips and her husband immediately drove to Calyisse’s apartment to get Patrick.
*609 Just before receiving this call from Patrick, Mrs. Phillips had called Gerald to find out where he was. He told her that he did not know but that he loved her. Alarmed by this, she called him again, and asked Gerald what was going on. Once again, Gerald told her he loved her and hung up. When Mr. and Mrs. Phillips, along with Patrick, arrived at their home, they found that Gerald’s bedroom had been ransacked. Gerald’s laptop computer, Play Station 3 and three watches were missing. Mrs. Phillips called 911.
1 ..¡Before any police officers arrived in response to her 911 call, Mrs. Phillips learned from a family member that Gerald had apparently been kidnapped and that there was a $10,000 ransom demanded for his return. Mrs. Phillips then received another call from Gerald’s cell phone. This time, a man whose voice she did not recognize demanded ransom money.
The family member who first alerted Mrs. Phillips to Gerald’s situation was Kimberly Bailey, her niece. Kimberly testified that at approximately 2:30 a.m., Gerald called her brother Kerry on his cell phone. Kerry was sleeping so she answered the phone. The caller hung up. The phone rang again, and again the caller hung up. The third time, Ms. Bailey answered and heard Gerald say: “I been kidnapped. Come get me.” She then asked Gerald if he knew who had him and Gerald responded “Yes.” At that moment, someone took the phone from Gerald and demanded $10,000 for Gerald’s release. Ms. Bailey asked the caller if $5,000 would be enough, as that was all she could get. The caller said yes and then hung up. The person demanding the ransom then called back and said that if the money was not at “Roecafella at 3:20” a.m., he “would be putting both of them [the victims] to sleep.”[1] The caller then allowed Gerald to get on the phone and he said: “Cousin, they’re not playing. They gon’ kill me.” A flurry of phone calls then took place regarding the ransom.
Officer Damon Banks responded to Mrs. Phillips’ call to police. Upon arriving at her home, Officer Banks learned of the latest calls for ransom. This development resulted in the involvement of the department’s Major Case Narcotics Unit. This unit worked in plain clothes and unmarked units, giving it the capacity to conduct undercover surveillance.
|4NOPD, in cooperation with the FBI, began investigating the case as an aggravated kidnapping. They obtained Gerald’s cell phone records and determined that Gerald had received a phone call from a number assigned to Kenneth Barnes, the defendant in these proceedings. At around 1:00 p.m. on April 19th, officers obtained a search warrant for the address associated with Mr. Barnes’ cell phone account. They proceeded there hoping to find Gerald and Calyisse.
The subject residence is one half of a New Orleans style double located at 2526 Barracks Street. Once on location, officers found Gerald’s car parked one half block away and then observed the defendant leave his residence carrying a box. They observed the defendant use a key to enter 2530 Barracks Street, the other half of the double. The defendant then exited 2530 empty-handed and returned to 2526 Barracks Street.
Because there was the potential for a hostage situation, a SWAT team cordoned off the area. After a period of surveillance during which officers observed several individuals go in and out of the Barracks Street residence, Mr. Barnes was taken into custody without incident. Mr. Barnes’ *610 cousin, Gregory Vincent, and Mr. Barnes’ girlfriend, Latasha Foster, were at the Barracks Street residence with the defendant and were also taken into custody.[2] In a search pursuant to the warrant, officers recovered the box they saw the defendant carrying which contained marijuana, a .38 caliber revolver with three live casings and two empty slots, money, two scales and packing material. They also recovered Calyisse Perkins’ silver purse, which contained her ID and personal items wrapped in a white T-shirt. They did not, however find Gerald or Calyisse.
1 sOnce in custody, Mr. Vincent gave a statement denying his involvement in the crimes and was released. Mr. Barnes did not give a statement. Due to evidence retrieved from his home, cell phone records, and other evidence linking him to the crime, the defendant was charged with kidnapping, home invasion, and possession of a weapon, marijuana and stolen property (Calyisse Perkins’ purse). At this point in the investigation, there was no evidence of Mr. Vincent’s involvement.
As the search for Gerald and Calyisse continued, cell phone records, subscriber information, and activity from cell towers led investigators to learn that several calls had taken place throughout the evening of April 18th and the early morning hours of April 19th between the defendant’s cell phone, Gregory Vincent’s cell phone, and Gerald’s cell phone. Records also established that one or more of these phones had travelled from Gert Town to Mid-City, to University Hospital, to the French Quarter and to the West Bank where both of the victims lived. Investigators were also able to determine that throughout much of this time period, the defendant’s phone and Vincent’s phone were in close proximity to each other though not in the same vehicle. The last call made from Gerald’s phone was at 3:13 a.m. on the morning of April 19th and it was made off of a cell phone tower which fed through the area where the victims’ bodies were eventually located.
By the time this evidence was developed, Mr. Vincent had left the city and gone to his home in Lake Charles. When he learned he was wanted by police, he turned himself in and informed police that Mr. Barnes had thrown the victims’ cell phones on the top of a school across the street from the defendant’s house. Officers retrieved these cell phones and confirmed that they belonged to the victims. Based on additional information provided by Mr. Vincent, detectives | regain searched the Barracks Street address. This time, their search yielded partially burned clothes and cut up pieces of plastic.
In connection with the ongoing investigation, Captain Jerome Laviolette with the NOPD presented a photographic lineup to Patrick Thayard in the presence of his grandmother at her home. Patrick was unable to identify anyone in the photo display; however, Gerald’s mother identified the defendant, Kenneth Barnes, as one of her son’s friends. From a different photographic line-up, Patrick picked out the photo of a man he identified as “the tall man with the white shirt on his hand” when he entered Calyisse’s apartment. This man was known to law enforcement as Layman Foster.[3] Thereafter, Patrick recognized the picture of a man on the news as the one who had come into Caly-isse’s apartment holding the handcuffs. During trial, Patrick identified this man as *611 the defendant, Kenneth Barnes. He explained that he was unable to pick Mr. Barnes out of the line-up on the night of the investigation because the defendant’s picture in the line-up was an old one. He recognized the defendant from TV broadcasts the day after the kidnapping and identified him in court during trial.
By the time of Mr. Barnes’ trial, which forms the basis of this appeal, Mr. Vincent and Mr. Foster had each been convicted of or had pled guilty to crimes associated with the kidnapping and murder and of Gerald and Calyisse.[4] They both testified in Mr. Barnes’ trial about the events leading up to the murders; their involvement; and that Mr. Barnes was the one who shot both victims. While there were some inconsistencies between their testimonies, Mr. Vincent and Mr. Foster 17were in general agreement about what happened on the night in question. Both Mr. Vincent and Mr. Foster testified that they expected to receive time off of their sentences for their cooperation.
The defendant also testified at trial. He, Mr. Vincent and Mr. Foster all testified that the defendant and Gerald knew each other from having bought and sold drugs together.
According to trial testimony of Mr. Vincent and Mr. Foster, the defendant believed that Gerald had overcharged him on previous marijuana deals. So, the defendant confected a scheme whereby the three of them (the defendant, Vincent and Foster) would rob Gerald. The plan was for Mr. Barnes to meet Gerald in a French Quarter parking lot, ostensibly to buy marijuana.[5] During the course of the drug transaction, Mr. Foster would appear and rob Gerald using a gun given to him by Mr. Barnes for this purpose.
Mr. Barnes, Mr. Vincent and Mr. Foster arrived at the location in the French Quarter in Mr. Vincent’s Tahoe. Gerald arrived at the location in his Nissan Maxima, which Calyisse was driving. Mr. Barnes then got out of the Tahoe and into Gerald’s car to make the drug buy. While Gerald and Mr. Barnes were engaged in the drug transaction, Mr. Foster, as planned, got into the Maxima armed with the gun and robbed Gerald. The defendant then demanded that Gerald get more money.
According to the testimony of Mr. Foster, the defendant then ordered that Caly-isse drive to both Gerald’s house and Caly-isse’s house, where they burglarized | seach residence. Mr. Vincent followed them in his Tahoe and participated in the burglaries. Both Mr. Vincent and Mr. Foster testified that Gerald’s nephew was in Caly-isse’s apartment when they burglarized it. Following the burglaries, they all drove back to the East Bank to the abandoned house on Broadway.
Once in the house on Broadway, Mr. Barnes continued to hold the victims against their will and demanded that Gerald come up with $10,000. Gerald called his cousin, Kerry, from his cell phone. Kimberly answered the phone. Mr. Barnes took the phone and said: “I got your people. Bring the money or I’ll kill him.” Mr. Barnes made several more calls to Kerry asking about the ransom. Kerry told the defendant that the money was on *612 the way. Then, Kerry told the defendant he had been stopped by the police. Believing the money was not coming, the defendant took one of Vincent’s gloves from him, put it on his hand, and shot both Calyisse and Gerald.
All three of the men ran from the house. Mr. Vincent drove back to Mr. Barnes’ residence on Barracks Street in his Tahoe, while the defendant and Mr. Foster took Gerald’s car. They dropped off the drugs, money, laptop computer, and Play Station. While changing his clothes, the defendant discovered that he had left his cell phone at the murder scene. The three men then returned to the murder scene to retrieve the defendant’s cell phone.
From there, they drove to a gas station on South Claiborne Avenue and Martin Luther King Jr. Boulevard. They returned to Barracks Street and divided the money and marijuana amongst themselves. They then drove to a gas station on Broad Street. They drove back to Barracks Street, cut up Calyisse’s credit cards and threw them and her purse in a garbage can outside the house. The defendant threw the victims’ cell phones onto the roof of a school across the street and | emptied the two spent bullet casings from his gun and put them in the trash. Mr. Vincent then drove Mr. Foster to the Iberville Housing Project and returned to Barracks Street for the night.
The following morning, Mr. Foster returned to the defendant’s house on Barracks Street. As he left the house, the police stopped him and took him into custody. He testified that he did not make a statement at that time because it was against the street code to talk to the police. At trial, Mr. Foster identified the defendant, the .38 caliber revolver the defendant used to execute the victims, and the handcuffs the defendant had placed on Gerald.
Mr. Vincent testified that he was in town visiting from Lake Charles and that he was staying at the defendant’s house. On the morning following the murders, the defendant woke him with the news that the police were outside. The defendant began flushing the marijuana down the toilet. Ultimately, Mr. Vincent and the defendant surrendered to the police. The defendant told Mr. Vincent not to snitch and not to worry about anything. Mr. Vincent assumed that the defendant meant he would “take his charge” and tell the police that Mr. Vincent had nothing to do with the crime. In a statement to police that day, Mr. Vincent denied any involvement or knowledge of the crime. As law enforcement had no information linking Mr. Vincent to the crime at that time, he was released from custody.
During his trial testimony, Mr. Vincent admitted that he made a false statement to police when he was first taken into custody. He acknowledged that he lied when he told the officers he had nothing to do with the kidnappings and murders, and that he was not in the house when the defendant shot the victims. He further testified that when the police initially released him, he returned to his home in Lake Charles. Later, when he learned there was a warrant for his arrest for J^accessory after the fact of murder, kidnapping and burglary, he turned himself in to the Lake Charles police. Despite the defendant’s claim (discussed below) that he left his phone in Mr. Vincent’s Tahoe from late on the evening of April 18th until early in the morning on April 19th, Mr. Vincent vehemently denied this assertion.
Kenneth Barnes testified on his own behalf. He testified that he and Gerald were in a lucrative drug dealing partnership. The defendant denied having any disagreements with Gerald and testified that he had no motive to kill him because they *613 were partners making money in a drug business. The defendant stated that he lived with his girlfriend, Latasha Foster (co-defendant Layman Foster’s sister) and that his cousin, Mr. Vincent, was staying with them at the Barracks Street address at the time of the killings.
The defendant testified that late in the evening on April 18, 2009, as he and Mr. Vincent were en route to University Hospital to visit a friend who had been shot, he and another friend, Terry Maxwell, made arrangements to purchase marijuana from Gerald. While at the hospital, he placed his cell phone in Mr. Vincent’s Tahoe to charge it. Rather than leaving the hospital with Mr. Vincent, the defendant testi-. fied that he got a ride home to Barracks Street from another friend, Troy LeBlanc. At this point, he discovered that he had left his cell phone charging in Mr. Vincent’s vehicle. The defendant said that he was at the hospital between 12:30 a.m. and 1:00 a.m. on April 19, 2009.
The defendant further testified that he awoke around 4:00 a.m. on April 19, 2009 when Mr. Vincent returned to Barracks Street. The defendant had no idea where Mr. Vincent had gone after leaving the hospital earlier that night. Shortly after Mr. Vincent returned to the house, Mr. Foster arrived at the Barracks Street residence. Mr. Vincent, Mr. Foster and the defendant drove to a gas station on | nMartin Luther King Boulevard and South Claiborne Avenue to purchase gasoline and liquor. From there, the threesome drove Mr. Foster to the Iberville Project. Mr. Vincent and the defendant then drove back to Barracks Street. Prior to going back to sleep, the defendant stashed his drugs and gun in the 2530 half of the Barracks Street residence. Shortly after going to sleep, the defendant learned that the police were outside his house. He stated that Mr. Vincent was very nervous and pacing in the back of the house when the police arrived. The defendant and Mr. Vincent voluntarily surrendered to the police. At police headquarters, Detective Kevin Burke questioned him about his movements the night before. He recounted his whereabouts of the previous night, described the clothing he wore,[6] and admitted that he and Gerald dealt drugs together. The defendant denied knowing anything about Calyisse’s purse and/or the cut up credit cards discovered at his residence.
The defendant admitted that he had pri- or convictions for possession of marijuana and simple robbery. He said that all of the State’s witnesses had lied against him. He claimed he had nothing to do with any of the crimes. He speculated that Gregory Vincent or Terry Maxwell had killed the victims.[7] He stated that Mr. Vincent’s desire to take over the defendant’s drug business was his motive for blaming the murders on him.
The defendant further testified that his nickname was “Killer Cam,” which was the name of a rapper he admired.[8] He also identified his voice on a jail telephone call he had made to Latasha Foster on April 22, 2009 instructing her to | ^execute an affidavit stating that he was with her from “12 to 4” on April 18-19, 2009.
After the defendant testified and the defense rested its case, the State called *614 one rebuttal witness, Ashley Morgan. Ms. Morgan, an employee of Satellite Tracking of People (STOP), explained that STOP manufactured and monitored ankle tracking devices for use by the criminal justice system and that Terry Maxwell was being monitored by STOP in April 2009. The company records indicated that between 10:00 p.m. and midnight on April 18, 2009, Mr. Maxwell moved from Gert Town to University Hospital to his home in Metair-ie. Upon his arrival in Metairie around midnight, he remained there until 11:10 a.m. on April 19th. Ms. Morgan verified that there was no record of Mr. Maxwell having been at the victims’ residences on April 18-19, 2009 or in the area where their bodies were discovered on April 20, 2009 during the time period in question.

ERRORS PATENT

A review for errors patent on the face of the record reveals none.

ASSIGNMENTS OF ERROR

Mr. Barnes raises two assignments of error. The first assignment is asserted by counsel. The second is filed by Mr. Barnes, pro se.
1. The evidence was insufficient to sustain his convictions for first degree murder.
2. He received ineffective assistance of counsel.

SUFFICIENCY OF EVIDENCE

11sBy this assignment of error, the defendant asserts that the evidence presented at trial was insufficient to support his convictions for first degree murder. He first contends that the testimony of his co-defendants, Gregory Vincent and Layman Foster, was contradictory and self-serving; that they lied to police; and, that they were inconsistent in their recitation of the events surrounding the burglaries of Gerald and Calyisse’s homes. He next argues that Patrick Thayard’s identification of him was unreliable as Patrick only identified him after seeing his picture three times on news broadcasts. These, he contends, taken together, make the evidence against him insufficient to prove his guilty beyond a reasonable doubt.
We review this assignment of error by considering the evidence in the light most favorable to the prosecution. The evidence, when viewed in this light, is not insufficient if any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Mussall, 523 So.2d 1305, 1311 (La.1988). As we review the evidence, we are mindful that a determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. State v. Silman, 95-0154, p. 12 (La.11/27/95), 663 So.2d 27, 35. As a reviewing court, we may impinge on the fact finding function of the jury only to the extent necessary to assure that the defendant has received due process of law in accordance with the Jackson standard of review. State v. Bordenave, 95-2328, p. 2 (La.4/26/96), 678 So.2d 19, 20.
There is little question that both Gregory Vincent and Layman Foster lied to police at times during the investigation into these murders. They admitted as much. There is also little question that their testimony was self-serving. They l14both hoped to gain time off of their sentences for their cooperation. These findings, however, are not critical to our analysis. Louisiana jurisprudence has long held that a jury may convict relying only upon an accomplice’s uncorroborated testimony. State v. Matthews, 450 So.2d 644, 647 (La.1984). Our jurisprudence has *615 also held that a jury may convict based on the testimony of someone making a plea bargain with the government, provided the testimony is not incredible or otherwise insubstantial on its face. State v. Neal, 2000-0674, p. 11 (La.6/29/01), 796 So.2d 649, 659 (citing United States v. Osum, 943 F.2d 1394, 1405 (5th Cir.1991)). Testimony should not be declared incredible on its face unless it asserts facts the witness physically could not have observed or events that could not have occurred under the laws of nature. Id.
In the instant case, there is far more evidence linking Mr. Barnes to these crimes than just that of “an accomplice’s uncorroborated testimony” and the testimony of “someone making a plea bargain with the State.”
The testimony of Mr. Barnes’ co-defendants was corroborated by much of the physical evidence secured from his residence, cell phone records, and an analysis of cell phone tower activity. Actual surveillance of Mr. Barnes and video footage obtained from two gas stations also corroborated their testimony. While it is true that no one other than the co-defendants were able to identify the defendant as the one who actually shot the victims, the jury was free to accept or reject their testimony on that or any other point.
Mr. Vincent admitted on the witness stand that he initially had lied to police when he was first taken into custody. He explained to the jury that he lied because he was scared and wanted no part of the crimes. He had recently been released from prison on a previous conviction and he was afraid of being sent back to prison | 15for a crime he did not commit. As to the way the events unfolded that April evening, Mr. Vincent testified as followed:
The whole plan was Kenneth’s idea because he was scoring weed from the guy and the weed — the guy he was scoring weed from was overtaxing him and he feel played. So by him feeling played, the guy overtaxed him, he decided to jack up. As I know, at first, it wasn’t supposed to be nothing, nobody getting killed or nothing, but Kenneth went farther with it.
Mr. Vincent also testified that he was terrified because he believed that the defendant had sent people to kill him and his family while he was in Lake Charles.
The defendant correctly notes that Mr. Vincent and Mr. Foster testified inconsistently regarding the order in which they burglarized the victims’ residences. However, it was within the province of the jury to weigh the relevance of this inconsistency. We cannot say that the inconsistencies caused their testimony to be “incredible as a matter of law.” While the record reveals that Mr. Vincent and Mr. Foster were not in agreement on the chronology of the evening’s events, their testimony concerning what happened at the locations is fairly consistent and is corroborated by other evidence.
Both men testified that they went into Gerald’s bedroom and stole money, a laptop computer and a Play Station 3. They also both testified that at Calyisse’s apartment, the defendant and Mr. Foster discovered Patrick Thayard playing a video game in the back room. Mr. Vincent located marijuana and a scale in the kitchen cabinets, while the defendant and Mr. Foster located money and marijuana in the back room. Mr. Foster said that Mr. Barnes handcuffed Gerald before the group left the apartment and drove to Gert Town, which is consistent with Mr. Vincent’s testimony that when the group arrived at the house on Broadway, Gerald was handcuffed as he entered the house. Finally, neither Mr. Vincent nor Mr. | ifiFoster ever wavered in their testimony *616 that the defendant was the one who shot the victims.
The record is replete with evidence corroborating Mr. Vincent’s and Mr. Foster’s testimony: Cell phone records and cell tower activity corroborated Mr. Vincent’s and Mr. Foster’s testimony regarding their travels throughout the city that evening. Specifically, both men testified that Mr. Vincent drove the Tahoe and followed the Maxima throughout the evening. Phone activity verified that numerous calls were made between the defendant’s phone and Mr. Vincent’s phone while the two phones were in close proximity to each other, but not in the same car. Both Mr. Vincent and Mr. Foster testified that they and the defendant went to two gas stations after the murders, and this testimony was corroborated by video surveillance captured from these two gas stations and introduced into evidence. Mr. Vincent and Mr. Foster both identified the gun recovered from Mr. Barnes’ residence as the murder weapon. Although Mr. Barnes argues that his co-defendants could have planted the murder weapon at his residence, there is no evidence to support this contention. Lt. Williams, who conducted surveillance of the defendant’s residence, witnessed Mr. Barnes access the 2530 side of the Barracks Street residence with a key. There was no evidence that Mr. Vincent and/or Mr. Foster had access to that key. Further, the victims’ cell phones were found on the roof of the school across from Mr. Barnes’ residence, supporting Det. Burns’ and Mr. Vincent’s testimony that Mr. Barnes had thrown them atop a school across from his residence. The police recovered Calyisse’s purse and pieces of plastic, which were determined to be Calyisse’s credit cards, in a garbage can in front of Mr. Barnes’ residence, further substantiating Mr. Vincent’s testimony.
|17The testimony of Mr. Vincent and Mr. Foster was not “incredible or otherwise insubstantial.” It was within the province of the jury to decide whether the testimony was plausible.
With respect to the testimony of Patrick Thayard, the defendant correctly notes that Patrick was unable to pick him out of the first photographic lineup he was shown. And, Patrick did testify that he had identified the defendant after seeing his face on TV broadcasts in connection with news stories about the murders. However, Patrick testified that he had identified Mr. Barnes from newscasts because that was what Mr. Barnes looked like when Patrick saw him on April 18, 2009. Patrick also testified that when he first talked to the police, he gave them a description of the defendant and his clothing, stating that the defendant wore a long sleeve blue shirt, black pants and had dreadlocks. Mr. Barnes confirmed that he had dreadlocks and wore a long sleeve blue shirt on April 18-19, 2009. The gas station videos reflect the same, and Det. Burns confirmed that Mr. Barnes had dreadlocks at the time. Photographs taken at the Barracks Street residence show a pair of burned black pants on the ground in the back yard.
Viewing the record as a whole and the evidence in the light most favorable to the prosecution, the jury’s finding the defendant guilty of two counts of first degree murder is fully supported by the evidence presented at the trial. This assignment has no merit.

INEFFECTIVE ASSISTANCE OF COUNSEL

 Generally, the issue of ineffective assistance of counsel is a matter more properly addressed in an application for post-conviction relief, filed in the trial court, where a full evidentiary hearing can be conducted. State v. Prudholm, 446 *617 So.2d 729, 737 (La.1984). Only if the record discloses sufficient evidence to rule |1son the merits of the claim do the interests of judicial economy justify consideration of the issues on appeal. State v. Seiss, 428 So.2d 444, 449 (La.1983).
In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court of the United States articulated a two-part test for determining the effectiveness of a criminal defendant’s counsel. First, the defendant must show that counsel’s performance was deficient, which requires showing that counsel made errors so serious that counsel was not functioning as the “counsel” guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced his defense. This requires a showing that counsel’s errors were so serious as to deprive the defendant of a fair trial. Unless a defendant makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable. Id. 466 U.S. at 687, 104 S.Ct. 2052.
Louisiana courts have adopted the two-pronged test established in the Strickland case for determining the effectiveness of counsel. In State v. LaCaze, 99-0584 (La.1/25/02), 824 So.2d 1063, the Louisiana Supreme Court discussed the effective assistance of counsel that a criminal defendant is afforded:
The Sixth Amendment does not guarantee “errorless counsel [or] counsel judged ineffective by hindsight,” but counsel reasonably likely to render effective assistance. Judicial scrutiny must be “highly deferential” and claims of ineffective assistance are to be assessed on the facts of the particular case as seen from “counsel’s perspective at the time,” hence, courts must indulge “a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance.”
99-0584, p. 20, 824 So.2d at 1078-79 (footnotes omitted.)
“Hindsight is not the proper perspective for judging the competence of counsel’s trial decisions. Neither may an attorney’s level of representation be determined by whether a particular strategy is successful.” State v. Brooks, 505 So.2d 714, 724 (La.1987). If trial counsel’s actions fall “within the ambit of trial strategy,” they do not establish “ineffective assistance of counsel.” State v. Bienemy, 483 So.2d 1105, 1107 (La.App. 4th Cir.1986).
In this case, the defendant asserts three claims of ineffective assistance of counsel.
First, the defendant claims that the State did not produce the entire police record, and/or that Det. Burns’ trial testimony was either “erroneous or false [and that this erroneous testimony] ... was used to claim that [his] testimony of [his] movements and association with the victims on the evening of the abductions was false.”
Mr. Barnes does not offer any evidence that the State did not produce the entire police report, and there is no evidence in the record to support this allegation. Nor does he explain in what instances Det. Burns’ testimony was erroneous or false. Det. Burns was cross-examined at length about both his report and his investigation of the murders. Defense counsel vigorously attacked Det. Burns’ testimony and the State’s evidence that Mr. Barnes killed the victims. Moreover, Mr. Barnes testified, proclaimed his innocence and disputed Det. Burns’ trial testimony. This portion of Mr. Barnes’ pro se argument of ineffective assistance of counsel is nothing more than generalized statements and con- *618 elusory charges, which do not remotely approach meeting the Strickland burden.
Next, the defendant asserts that defense counsel was not prepared for trial in that he did not have ballistics or cell phone experts or a fact investigator. Once again, Mr. Barnes does not set forth a reason why trial counsel should have obtained any experts or investigators, let alone how he was prejudiced by counsel’s failure to retain them.
12()The defendant was not convicted on ballistics evidence. The State’s ballistics expert, Off. Kenneth Leary, Jr., testified that he test-fired ammunition in the Smith & Wesson model 642, .38 caliber revolver recovered from 2530 Barracks Street and compared it to bullets recovered from the victims’ autopsies. Off. Leary concluded that while the test-fired bullets exhibited similar rifling characteristics to those of the weapon recovered from 2530 Barracks Street, he could not say with certainty that the autopsy bullets were fired from the weapon he tested. As there was no State expert to conclusively testify that the weapon seized from Mr. Barnes’ residence was the murder weapon, counsel may well have concluded there was no need for a defense ballistics expert. Only Mr. Foster and Mr. Vincent identified the revolver as the weapon Mr. Barnes used to kill the victims, and Mr. Barnes refuted their testimony by repeatedly denying he shot anyone.
As for the cell phone records, FBI Agent Wendell Cosenza verified the high frequency of cell phone calls between Gerald, Mr. Vincent and the defendant on the night/morning of the kidnappings/murders. The agent also mapped the pattern of movements of those cell phones throughout the city during the pertinent time frame of the crimes. However, the record reflects that through defense counsel’s skilled and thorough cross-examination, defense counsel established that Agent Co-senza was unable to determine that Mr. Barnes was in fact the person who actually placed and/or received calls associated with the cell number assigned to his account during the pertinent time frame. That information may possibly have had a greater impact on the jury coming from the State’s witness, rather than a defense witness. Consequently, as with not obtaining a ballistics expert, defense | gicounsel may have believed a defense witness’ testimony regarding the cell phone records would merely have been cumulative.
Turning to the defendant’s assertion as to the lack of a fact investigator, he does not identify any witnesses an investigator might have developed who would have been beneficial to his defense. Thus, he has not established any prejudice from the lack of experts and/or an investigator.
Finally, Mr. Barnes asserts:
My attorney had a serious communication problem. Much of the time he could not be heard or understood by the judge, the jury, and others in the courtroom. The judge stated her alarm that my attorney’s communication difficulties, especially since it appeared he was not audible to the jury, could mean that I was not getting an adequate defense.
There is nothing in the record to support this claim. There were occasions when defense counsel, prosecutors and witnesses were all asked to speak up so that everyone could be heard. However, there is no indication whatsoever in the record that defense counsel had “serious communication problems” or that the trial judge felt Mr. Barnes “was not getting an adequate defense.”
The defendant has failed to establish any errors on the part of trial counsel, let *619 alone errors which prejudiced him so as to brand trial counsel’s conduct as falling below the standards of reasonableness and competency required by prevailing professional standards demanded of attorneys in criminal cases. Strickland, supra. This assignment is without merit.

CONCLUSION

For the foregoing reasons, we affirm Mr. Barnes’ convictions.
AFFIRMED.

. At the time, Club Roecafella was a bar/music venue in Gert Town.

. Mr. Vincent's blue Tahoe was parked in front of the Barracks Street residence.

. Mr. Foster is the brother of the defendant’s girlfriend, Latasha Foster. He had been questioned leaving Mr. Barnes’ apartment earlier in the investigation.

. Mr. Vincent was convicted of two counts of second degree murder and then pled guilty to two counts of aggravated kidnapping, and two counts of aggravated burglary. Mr. Foster pled guilty to two counts of manslaughter, two counts of second degree kidnapping and two counts of aggravated battery.

. The meeting was initially to take place at University Hospital in Mid-City, but Gerald apparently changed the location.

. The defendant testified that he wore a blue long sleeved shirt, blue pants and brown Timberland boots on the night in question.

. Terry Maxwell was murdered on May 17, 2009 — one month after these murders.

.On cross examination, the State identified "Killer Cam” as a proponent of the "don’t snitch” street code.