TERRI F. LOVE, Judge.
1 jThis appeal arises from the arrest, conviction, and sentence of the defendant for aggravated rape and aggravated kidnapping. The defendant alleges that the trial court erred by denying his Motion to Continue Trial by admitting evidence of his 1983 aggravated burglary conviction pursuant to La. C.E. art. 412.2, in reversing its original ruling to exclude the State’s introduction of other crimes evidence pursuant to La. C.E. art. 404(B), and that the evidence of his prior conviction for aggravated burglary prejudiced him in the eyes of the jury in that it served no other purpose than to infer a propensity to commit criminal acts. Pro se, the defendant contends that the trial court abused its discretion by denying his Motion for Mistrial based upon E.W.’s highly emotional state during her trial testimony, a claim of ineffective assistance of counsel in failing to object to the validity of the test methodology under a Daubert analysis, in failing to object to the chain of custody, in failing to retain a DNA expert, and that he was denied his constitutional rights to confront/cross examine the analysts who performed the DNA.
We find that the trial court did not abuse its discretion in denying the defendant’s Motion to Continue Trial, by admitting the evidence of his 1983 aggravated burglary conviction pursuant to La. C.E. art. 412.2 and art. 404(B), and 12the alleged prejudice of the evidence of his 1983 aggravated burglary conviction was outweighed by the probative value. Additionally, the trial court did not err in denying the defendant’s request for a mistrial or in its holdings regarding the DNA evidence. Lastly, Mr. Mark was not denied the effective assistance of counsel. Therefore, we affirm the defendant’s conviction and sentence.

FACTUAL BACKGROUND

In 1994, E.W.[1] lived with her father on the corner of Jackson Avenue and Robertson Street. While walking through an alley to the rear of her house at approximately 3:00 a.m. on June 5, 1994, E.W. noticed a man using a payphone next to her house. E.W. was struck in the back of her head and lost consciousness. The perpetrator held her in a choke hold and threw her into a car. At an abandoned location, the perpetrator stabbed E.W. in her arm, hand, and fingers. After the beatings and knifing, the perpetrator forced E.W. to perform oral sex on him. He then vaginally raped and sodomized E.W.

PROCEDURAL HISTORY

On May 31, 2012, the State indicted Johnnie Mark with one count each of ag *892 gravated kidnapping and aggravated rape, violations of La. R.S. 14:44 and La. R.S. 14:42, respectively, in connection with the June 5, 1994, kidnapping and rape of E.W. Mr. Mark pled not guilty. The trial court denied Mr. Mark’s Motion to Suppress the Evidence, a buccal swab. Mr. Mark sought supervisory review of that ruling, and this Court denied relief on October 16, 2012. See State of Louisiana v. Johnnie R. Mark, unpubl, 12-1259 (La.App. 4 Cir. 10/16/12).
| ¡¡Mr. Mark filed a Motion for Continuance, which was denied by the trial court. Mr. Mark sought emergency supervisory review of the denial from this Court, which was granted. See State of Louisiana v. Johnnie Mark, unpubl., 13-0318 (La.App. 4 Cir. 3/12/13). However, the Louisiana Supreme Court reversed this Court’s ruling and reinstated the trial court’s denial of Mr. Mark’s Motion to Continue the Trial. See State of Louisiana v. Johnnie Mark, 13-0556 (La.3/14/13), 109 So.3d 368. The Louisiana Supreme Court then denied Mr. Mark’s request for rehearing.
Subsequently, a jury trial commenced and concluded with the jury returning unanimous verdicts of guilty on each count of the indictment. Mr. Mark filed a Motion for New Trial, which the trial court denied.
The trial court sentenced Mr. Mark to a life sentence on each count of the indictment, sentences to run concurrently, and to be served without benefit of parole, probation, or suspension of sentence. The trial court then granted Mr. Mark’s motion for appeal.

TESTIMONY & EVIDENCE

E.W.

In 1994, E.W. was forty years old, had two children, and lived on the corner of Jackson Avenue and Robertson Street with her father. In order to access her apartment, E.W. had to traverse an alley to the rear of the house. After 3:00 a.m. on June 5, 1994, E.W. returned home after attending a party. As E.W. was unlocking the gate to the alley leading to her apartment, she noticed a man using a payphone next to her house. As E.W. entered the alley, she was struck in the back of her head and lost consciousness. She regained consciousness as the man held her in a choke hold and threw her into a car. He punched E.W. in the face, and she |4lost consciousness. He continued to beat her as he drove away from her neighborhood. When they arrived at an abandoned area, E.W.’s attacker stabbed her in her arm, hand, and fingers. He stated that he was going to kill her, and that he had destroyed other women because women were worthless. He also said that he had killed other people. E.W. grabbed the knife blade and begged for her life. However, E.W.’s attacker continued to beat her in and out of consciousness. He then began choking her, telling her she would never see her children again. When E.W. refused to let go of the blade of the knife, he said: B* ⅜ *h, turn the knife loose. I’m going to kill you either way. Turn the f* * * * *g knife loose. E.W. refused to let go of the knife. E.W.’s fingers were almost severed from her hand. After the beatings and knifing, the man forced her to perform oral sex on him. He then vaginally raped and sodomized E.W.
E.W.’s next memory was lying on the pavement in the street. E.W. ran to a porch to ask for assistance. A woman responded, but refused to help E.W. A young man told E.W. that he was afraid to help her because the New Orleans Police Department (“NOPD”) might think he was her attacker; however, he called the NOPD and continued to talk to her until the ambulance and NOPD arrived.
*893 E.W. gave the police a description of her attacker, and after her release from the hospital, she compiled a sketch of the man who kidnapped and raped her.

Lyndrell Varise

Lyndrell Varise, an NOPD 911 operator and custodian of 911 call recordings, identified the incident recall numbered F-7347-94 as the written memorialization of an early morning June 5, 1994 emergency call requesting help. The 911 caller gave a location of 1400 South Roman Street. The 911 call came in as “unknown trouble, female screaming for help.” The 911 caller described the | .¡perpetrator as a forty year old black male, approximately 6' tall, wearing glasses and driving a brown Delta Eighty-Eight vehicle.

Officer Don Kinney

NOPD Officer Don Kinney responded to the 911 call. He observed knife lacerations to E.W.’s left hand. E.W. reported to Officer Kinney that she was kidnapped and raped.

Detective Tracey Mercadel

Former NOPD Detective Tracey Merca-del was the lead detective. Detective Mer-cadel arrived at the scene at approximately 5:00 a.m. and spoke briefly with E.W. as she was placed in an EMS unit. E.W. was extremely emotional and in severe pain. Detective Mercadel noted that E.W. suffered a blackened and swollen left eye, lacerations to her left hand and chest, stomach injuries, and bruising to the neck. Because of E.W.’s condition, Detective Mercadel was only able to obtain E.W.’s name. EMS transported E.W. to Charity Hospital for medical attention and a sexual assault examination. Detective Mercadel collected E.W.’s clothing at the hospital.
Detective Mercadel transported the rape kit from the hospital at 12:30 a.m. on June 6, 1994, and deposited it in Central Evidence and Property (“CEP”) along with E.W.’s clothing-one lady’s brown body suit and one brown pair of lady’s stretch pants. Detective Mercadel received a receipt for the deposit of the evidence. NOPD crime lab technicians received the rape kit, tested the forensic evidence contained therein, and rendered a report.
Detective Mercadel then interviewed E.W. at her residence at about 11:00 p.m. on June 5, 1994. E.W. drew a sketch of the perpetrator, which Detective Mercadel copied and supplied to other police districts. No leads were developed, | fiand the matter became a cold case file.

Dr. Jean Friday

Dr. Jean Friday, an emergency medicine physician, performed the sexual assault examination on E.W. at approximately 3:00 a.m. on June 5, 1994, and authored a report detailing her examination of E.W. Dr. Friday noted E.W.’s personal information and E.W.’s explanation of the assault and rape. Dr. Friday collected samples— saliva, pubic hairs, vaginal swabs, and fingernail scrapings — for the rape kit. Thereafter, the rape kit was marked for identification and placed under refrigeration. E.W.’s physical examination also revealed lacerations to her face and fingers, which required sutures, two black eyes, and a subconjunctival hemorrhage of the left eye.
Vaginal and oral swabs, fingernail scrapings, and public hair collections taken from E.W. were placed in the rape kit which was sealed and placed under refrigeration in a secure room at the hospital. All of the samples were marked with E.W.’s name and the date and time the evidence was collected. The rape kit was also identified by the incident recall number assigned to this case.

Detective Frances Jarrott

Detective Frances Jarrott of the NOPD sex crimes unit received a Combined DNA *894 Index System (“CODIS”) match letter from the Louisiana State Police Crime Lab (“LSPCL”) indicating a match between DNA recovered in this case and the CO-DIS data base. The CODIS data base is maintained by the Federal government and contains DNA taken from arrested and/or convicted subjects and unknown DNA samples from crime scenes. Detective Jarrott obtained original reports from this case, located E.W., and the identified suspect, Mr. Mark. Detective Jarrott obtained and executed a warrant for Mr. Mark’s arrest. To confirm the CODIS 17match, Detective Jarrott obtained a search warrant and retrieved a reference DNA sample via buccal swab from Mr. Mark. Detective Jarrott deposited the buccal swab in CEP, and later transported it to the LSPCL. Detective Jarrott interviewed E.W., who denied knowing Mr. Mark or having consensual sex with Mr. Mark on June 5,1994.

Officer Cornelias Shelton

In connection with the State’s Prieur evidence, retired NOPD Officer Cornelias Shelton testified that he investigated a May 23, 1983 aggravated burglary in the 5800 block of North Rocheblave Avenue. He and his partner spoke with the battered and bruised female victim, N.R.[2] Officer Shelton noted that the rear screened door of the residence was cut. He also observed blood on N.R., in the kitchen, and the backyard. In addition, there was a trail of blood leading from N.R.’s back yard into her neighbor’s yard. Officer Shelton determined that the suspect was N.R.’s neighbor. N.R. identified Mr. Mark as her attacker.
MR.[3]
On the day of the 1983 burglary incident, N.R. was standing in her front door and said hello to a passing stranger. N.R. walked to the kitchen and heard someone at the back door ask: Why don’t you talk to me. N.R. told the stranger that she had a husband and asked the stranger to leave. As N.R. was resting in her bedroom, she heard a noise in the kitchen. When N.R. investigated, she found Mr. Mark armed with a knife, cutting the screen door, and entering the kitchen. | ^Believing that Mr. Mark was going to rape and/or kill her, she threw herself at him, and they tumbled down the stairs into the backyard. N.R. fell onto the ground with Mr. Mark straddling her. Mr. Mark had one hand over her mouth and the knife in his other hand. Mr. Mark threatened her: If you scream I’m going to kill you If you scream I’m going to f* * * * *g kill you. N.R. responded: “Well, I guess you are just going to have to f;: * * * *g kill me.” N.R. then struck Mr. Mark, causing him to cut himself with the knife. When Mr. Mark dropped the knife, N.R. threw it into her neighbor’s yard and ran. A neighbor called the police. N.R.’s neighbor, Deloris, told her the assailant’s name was “Johnnie Mark.” During the police investigation, N.R. identified Mr. Mark as her attacker from a photo lineup.

Officer George Jackson

Officer George Jackson testified by stipulation as an expert in taking and analyzing fingerprints. Officer Jackson fingerprinted Mr. Mark prior to the trial in this case. He identified the set of prints he took and a certified copy of an arrest register containing fingerprints. Officer *895 Jackson compared the prints and concluded that the prints matched. Next, Officer Jackson identified a cert pack and, after comparing the information contained therein with the information contained in the arrest register, concluded that the information was the same and positive identification of Mr. Mark as being convicted of the 1983 aggravated burglary of N.R.[4] Officer Jackson testified that there was no doubt in his mind that the person identified by the prints and information was Mr. Mark.

Patricia Daniels

Patricia Daniels, the retired head of the pathology lab at the Orleans Parish |;)Coroner’s Office, was qualified as an expert in the field of forensic serology, which is the study of bodily fluids, including seminal fluid, blood, and saliva. Ms. Daniels performed the analyses of items collected at the hospital during rape examinations, conducted the testing at the NOPD crime lab. Ms. Daniels stated that the rape kits were brought to her from CEP by the NOPD. Upon completion of her testing, the specimens were placed in the freezer in the crime lab for further handling.
Ms. Daniels received E.W.’s rape kit on June 6, 1994, and identified her lab report (Item No. F-7347-94) prepared after examining the items in the rape kit. Internal and external vaginal swabs were positive for seminal fluids, and slides containing seminal fluid were positive for spermatozoa. The oral and the external vaginal swabs and smears were negative for seminal fluid and spermatozoa.

Anne Montgomery

Anne Montgomery, an expert in the field of molecular biology and DNA analysis, was employed at the time of trial as a lab director for Innogenomics, a DNA testing laboratory. Ms. Montgomery served as the DNA Technical Leader for the NOPD Crime Lab from 2001-2006 and was rehired in that position in October 2010. The City of New Orleans hired Ms. Montgomery as a professional contractor to establish a DNA lab within the crime lab and seek accreditation.
Ms. Montgomery testified that in approximately 2003, the federal government provided grant money for local agencies to process backlogged evidence for DNA profiles. Because of limited manpower, the NOPD outsourced rape kits to accredited private laboratories to develop the DNA profiles. While working with the NOPD in 2003 or 2004, Ms. Montgomery learned of a batch of rape/sexual assault kits from 1987 to 2003 that were screened by the Coroner’s |inoffice as sperm positive, but which were being stored, with nothing further processing. Grant money was secured, and she estimated that seven to eight hundred sperm positive samples were outsourced for DNA profiling. A majority of the DNA profiles generated by this private lab testing was uploaded into CODIS in the “unknown” forensic evidence database.
Ms. Montgomery identified the ease file in this matter, assigned Item # F07347-94, and the envelopes containing the FTA stain card for E.W.’s reference sample, as well as the evidence tubes and swabs obtained during the E.W.’s rape examination, respectively. She received the foregoing evidence from the DNA lab on February 15, 2005, and then relinquished it to the ReliaGene Technologies (“ReliaGene”) lab the same day. ReliaGene returned the evidence to Ms. Montgomery on May 4, 2005, with proof of the internal chain of custody, worksheets, raw data, and Relia-Gene’s forensic test results. The CODIS *896 Data Entry Review signed by Jennifer Schroeder, confirming that the test results were appropriate and the results were uploaded into CODIS in 2005, was identified. A CODIS spreadsheet, another check to confirm that everything in the file bears the correct identifying numbers of this case was presented. Ms. Montgomery identified the ReliaGene test report issued in this case. The ReliaGene test report indicated that the sperm fraction of the sample produced a profile consistent with one male donor.
In 2011, the National DNA Index System (“NDIS”) found a match between the unknown male DNA profile under NOPD Item # F-07347-94 and a known offender, Mr. Mark. Pursuant to notification, another confirmation test was done via a buccal swab taken from Mr. Mark. Testing proved a match between the DNA obtained from Mr. Mark’s buccal swab and the DNA of the offender |nreferenced in the NDIS match notification letter. Statistically, that the chances of any male other than Mr. Marks contributing the DNA sample in this case was one in 127 quadrillion.

Gina Pineda

Gina Pineda, a State witness and the owner of the independent consulting firm, GMP Forensic Consultants, testified that she consulted for various agencies in the field of forensic DNA testing. Ms. Pineda worked in the field of DNA analysis since 1996. During various stages of her career, she worked as an assistant lab director and technical leader at ReliaGene and Orchid Cellmark. In 2005, ReliaGene contracted with the NOPD to process rape kit samples and to obtain DNA profiles from the samples. The samples were hand delivered to ReliaGene by the NOPD and then retrieved by the NOPD after testing was completed. ReliaGene was required to maintain a chain of custody document whenever samples came to and left the lab. Those procedures were followed and memorialized in this case file. The case file recorded every step performed in every case brought to the lab. Every step was documented, as was the identity of lab personnel who performed the step, the nature of the step, and who witnessed the step.
Ms. Pineda confirmed that ReliaGene received specimen nos. N02096S and N020967 under Item # F-07347 of 1994. Specimen 2096 was a vaginal swab from E.W.’s rape kit, and 2097 was a reference blood stain from E.W. Ms. Pineda identified the two-page final report issued by ReliaGene in this case. (ReliaGene reference # F-32297). The report summarizes the type of testing performed, test results, interpretation of those results in the form of conclusions and the raw data that was produced by the testing.
hpMs. Pineda said that the lab performed a differential extraction, the epithelial cell fraction, which separates any female DNA that might be present in the sample. Then the lab extracted the sperm fraction, which contained a DNA profile from the sperm cells found on the vaginal swab. The second page of the ReliaGene report charted the DNA test results. Once the test results were complete, the evidence was returned to the NOPD. The case file generated by ReliaGene is maintained indefinitely, and a copy is provided to the submitting agency (NOPD). The NOPD then reviews ReliaGene’s work to ensure that the results are correct and accurate.
Ms. Pineda identified the LSPCL report, which contained her signature as having performed the analysis of the test results of the buccal swab taken from Mr. Mark and the DNA profile obtained from the sperm fraction of the vaginal swab taken from E.W. Ms. Pineda concluded *897 that the DNA profile obtained from the sperm fraction of the vaginal swab was consistent with the DNA profile obtained from the reference sample (buccal swab) from Mr. Mark. Ms. Pineda confirmed that although she signed the ReliaGene report, the actual testing was performed by Angela Delatte.

Angela Delatte

Angela Delatte was employed, in April 2012, by the LSPCL as a DNA analyst and was qualified as an expert in the field of molecular biology and DNA analysis in New Orleans and Baton Rouge. The LSPCL received notice from CODIS, which prompted her to perform her analysis of the reference swab. Ms. Delatte developed a DNA profile from the swab. Then she compared the profile generated from the swab to the ReliaGene report, and made a statistical analysis. The DNA profile obtained from the sperm fraction of the vaginal swab was consistent with the DNA profile obtained from the reference sample from Mr. |1sMark. After analysis, Ms. Delatte concluded: “Assuming one contributor [as in this case], the probability of finding the same DNA profile if the DNA had come from an unrelated random individual other than Johnnie Mark was approximately one [in 127 quadrillion].”

ERRORS PATENT

A review for errors patent on the face of the record reveals none.

MOTION TO CONTINUE TRIAL

Mr. Mark asserts that the trial court abused its discretion by denying him a continuance of trial, which he urged on the basis of the State’s late notice of its intent to offer evidence of Mr. Mark’s 1988 aggravated burglary conviction.
“A motion for continuance, if timely filed, may be granted, in the discretion of the court, in any case if there is good ground therefor.” La.C.Cr.P. art. 712. A trial court’s “decision to grant or refuse a motion for a continuance rests within the sound discretion of the trial judge, and a reviewing court will not disturb such determination absent a clear abuse of discretion.” State v. Reeves, 06-2419, p. 73 (La.5/5/09), 11 So.3d 1031, 1078.
Mr. Mark filed his Motion for Continuance of Trial on March 8, 2013, arguing that the State’s notice, filed five days prior to trial, prejudiced his ability to investigate the evidence of the 1983 aggravated burglary conviction. In a supplemental Motion for Continuance, Mr. Mark averred that his attempts to interview N.R. from the 1983 conviction were thwarted by the prosecutor’s instruction to N.R. not to speak with Mr. Mark’s counsel.
The trial court denied the continuance, finding that the State’s notice provided enough time to investigate the 1983 conviction. The trial court also noted that Mr. Mark failed to demonstrate that his defense strategy would change or that 114he would be able to rebut the evidence had he learned of it sooner. This Court granted Mr. Mark’s writ seeking reversal of the trial court judgment denying the continuance. See State of Louisiana v. Johnnie Mark, publ., 13-0318 (La.App. 4 Cir. 3/12/13). However, the Louisiana Supreme Court reversed this Court’s ruling and reinstated the trial court’s denial of Mr. Mark’s Motion to Continue the Trial finding “no clear abuse of the trial court’s broad discretion in ruling on the motion for continuance.” See State of Louisiana v. Johnnie Mark, 13-0556 (La.3/13/13), 109 So.3d 368.
The “law of the case” doctrine is well-settled. This Court expounded upon its usage in State v. McElveen, 10-0172, p. 24, fn. 8 (La.App. 4 Cir. 9/28/11), 73 So.3d 1033,1054, as follows:
*898 The “law of the case” doctrine applies to all prior rulings or decisions of an appellate court or the Supreme Court in the same case, not merely those arising from the full appeal process. See Pumphrey v. City of New Orleans, 2005-0979 (La.4/4/06), 925 So.2d 1202. This policy applies to parties who were parties to the case when the former decision was rendered and who thus had their day in court. The reasons for the “law of the case” doctrine is to avoid relitigation of the same issue; to promote consistency of result in the same litigation; and to promote efficiency and fairness to both parties by affording a single opportunity for the argument and decision of the matter at issue. Day v. Campbell-Grosjean Roofing and Sheet Metal Corp., 260 La. 325, 256 So.2d 105 (1971). This doctrine is not an inflexible law; thus appellate courts are not absolutely bound thereby and may exercise discretion in application of the doctrine. It should not be applied where it would accomplish an obvious injustice or where the former appellate decision was manifestly erroneous.
On appeal, Mr. Mark re-asserts the same arguments he originally advanced in seeking a continuance of trial, but he urges reconsideration of the matter in light 115of N.R.’s 1983 testimony[5] in relation to Mr. Mark’s aggravated burglary conviction. Mr. Mark contends that “numerous discrepancies” [6] between N.R.’s 1983 testimony and her 2013 trial testimony in this case regarding the sexual nature of his 1983 conviction render the denial of the continuance questionable. Further, Mr. Mark asserts that the “discrepancies” provide a new basis by which to assess the correctness of the trial court’s denial of the motion for continuance. In addition, Mr. Mark maintains that the “discrepancies” preclude the application of the “law of the case” doctrine thereby allowing reconsideration of this claim on appeal.
Comparison of N.R.’s 1983 testimony with her 2013 trial testimony in this case disproves Mr. Mark’s “numerous discrepancies” assertion. N.R.’s testimony during this 2013 trial and her 1983 testimony are materially identical. Thus, Mr. Mark has not presented any new evidence the Louisiana Supreme Court erred in ruling that the trial court did not abuse its discretion by denying the motion to continue. Mr. Mark has not demonstrated that injustice would be done in refusing to reconsider this claim. Therefore, we find that this assignment of error is barred by the “law of the case” doctrine.
Irrespective of the “law of the case” doctrine and on a showing of an improper denial of a motion for a continuance, “a reviewing court should generally decline to reverse a conviction ... absent a showing of specific prejudice.” Reeves, 06-2419, p. 73, 11 So.3d at 1079, quoting State v. Blank, 04-0204 p. 9 (La.4/11/07), 955 So.2d 90, 140. Mr. Mark’s conviction of the charged offenses was not dependent on his 1983 conviction. Accordingly, Mr. Mark cannot show 11fiany prejudice owing to the denial of his Motion to Continue. The scientific evidence conclusively proved Mr. Mark’s guilt to “... the probability of finding the same DNA profile if the DNA had come from an unrelated random individual other than Johnnie Mark [as] approximately one [in 127 quadrillion chances].” Therefore, we find that Mr. Mark’s assignment of error lacks merit.

*899
EVIDENCE OF PRIOR CONVICTION

Mr. Mark contends the trial court erred by admitting evidence of his 1983 aggravated burglary conviction pursuant to La. C.E. art. 412.2. Mr. Mark asserts that the nature of the prior conviction shows that the prior bad act was not sexually assaultive and should not have been allowed at trial.
La. C.E. art. 412.2 provides in pertinent part that [w]hen an accused is charged with a crime involving sexually assaultive behavior, ... evidence of the accused’s commission of another crime, wrong, or act involving sexually assaultive behavior ... may be admissible subject to the balancing test imposed by La. C.E. art. 403. La. C.E. art. 403 provides that relevant “evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.” “[A] trial court’s ruling admitting/permitting the introduction of evidence carries with it an implicit conclusion that the trial court found that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, as per La. C.E. art. 403.” State v. Vargas-Al-cerreca, 12-1070, p. 30 (La.App. 4 Cir. 10/2/13), 126 So.3d 569, 586.
A trial court’s ruling on the admissibility of evidence of other crimes will not be overturned absent an abuse of discretion. State v. Wright, 11-0141, pp. 10-11 (La.12/6/11), 79 So.3d 309, 316. “This same standard is applied to rulings on 117the admission of other crimes evidence and evidence under La. C.E. art. 412.2.” Id., 11-0141, p. 11, 79 So.3d at 316.
On the day of trial, the trial court judge held a hearing in chambers -with the prosecutor, Mr. Mark’s counsel, Mr. Mark, and N.R. to determine whether her testimony regarding the 1983 event would be admissible pursuant to La. C.E. art. 412.2. During the trial court judge’s questioning, N.R. recalled that as she stood in her front door, Mr. Mark walked by and the two exchanged pleasantries. She went into her kitchen in the back of the house. Mr. Mark was standing at the back door, and he told her he wanted to talk to her. N.R. told Mr. Mark that she had a husband and asked him to leave. As she was resting in her bedroom, she heard a noise and went to investigate. Mr. Mark cut the back screened door and was standing in the kitchen armed with a knife. N.R. forced her way past him and as she did so, they both fell to the ground in the backyard. Mr. Mark was straddling her, while holding the knife in one hand and covering her mouth with his other hand. Mr. Mark threatened to kill N.R. if she screamed. She hit him, knocked the knife from his hand and ran screaming down the alley. Other than threatening to kill her, Mr. Mark did not speak. N.R. could not remember whether Mr. Mark tore her clothing during the attack. When the trial court judge asked if there was any sexual attempt against her by Mr. Mark, she responded: “Well, I felt — What I felt was he was going to rape and kill me ... Why would he come in on me in the first place •with a knife.... ”
Mr. Mark’s assertion that he did not grab N.R. in a sexual manner or vocalize his intent to rape her does not prove there was no intent on his part to commit a sexual assault. N.R. believed Mr. Mark intended to rape and kill her. His failure to sexually assault N.R. does not negate his initial intent. Therefore, we [18find that the trial court was reasonable in finding that Mr. Mark’s actions in 1983 amply proved his intent to sexually assault N.R. when he broke into her residence.
*900 “Nevertheless, if the evidence was erroneously admitted at trial, the trial court’s ruling is subject to the harmless error analysis.” State v. Hugle, 11-1121, p. 19 (La.App. 4 Cir. 11/7/12), 104 So.3d 598, 613. An error is harmless if “the verdict actually rendered was surely unattributable to the error.” State v. Johnson, 94-1379, p. 18 (La.11/27/95), 664 So.2d 94, 102.
In the present case, if there was error in the admission of the other crimes evidence, we do not find that it contributed to the guilty verdict. The uncontroverted DNA evidence conclusively proved that Mr. Mark was guilty of the aggravated kidnapping and aggravated rape of E.W.

PRIEUR NOTICE

Mr. Mark avers that the trial court erred in reversing its original ruling to exclude the State’s introduction of other crimes evidence pursuant to La. C.E. art. 404(B). Mr. Mark asserts that the State’s Prieur notice failed to specify the exception to the general exclusionary rule upon which it relied for admissibility of the evidence of other acts or offenses. In addition, Mr. Mark contends the State failed to demonstrate that the other acts satisfy one of the requirements listed in La. C.E. art. 404(B), and further, to show that the probative value of the evidence outweighed its prejudicial effect.
La. C.E. art. 404(B)(1) states:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the 119accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
The Louisiana Supreme Court set forth the applicable law in State v. Rose, 06-0402, pp. 12-13 (La.2/22/07), 949 So.2d 1236,1243-44, as follows:
It is well settled that courts may not admit evidence of other crimes to show the defendant as a man of bad character who has acted in conformity with his bad character. La. C.E. art. 404(B)(1); State v. Williams, 96-1023, p. 30 (La.1/21/98), 708 So.2d 703, 725; State v. Prieur, 277 So.2d 126, 128 (La.1973). Evidence of other crimes, wrongs or acts committed by the defendant is generally inadmissible because of the “substantial risk of grave prejudice to the defendant.” Prieur, 277 So.2d at 128. However, the State may introduce evidence of other crimes, wrongs or acts if it establishes an independent and relevant reason such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. La. C.E. art. 404(B)(1). The State must provide the defendant with notice and a hearing before trial if it intends to offer such evidence. Prieur, 277 So.2d at 130. Even when the other crimes evidence is offered for a purpose allowed under art. 404(B)(1), the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defendant’s defense. State v. Martin, 377 So.2d 259, 263 (La.1979); Prieur, 277 So.2d at 130. The State also bears the burden of proving that defendant committed the other crimes, wrongs or acts. State v. Galliano, 2002-2849, p. 2 *901 (La.1/10/03), 839 So.2d 932, 933 (per cu-riam ).
Although a defendant’s prior bad acts may be relevant and otherwise admissible under La. C.E. art. 404(B), the court must still balance the probative value of the evidence against its prejudicial effects before the evidence can be admitted. La. C.E. art. 403. Any inculpatory evidence is “prejudicial” to a defendant, especially when it is “probative” to a high degree. State v. Germain, 433 So.2d 110,118 (La.1983). As used in the balancing test, “prejudicial” limits the introduction of probative evidence of pri- or misconduct only when it is unduly and unfairly prejudicial. Id. See also Old Chief v. United States, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997)(“The term ‘unfair prejudice,’ as to a Uncriminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.”). (Footnote omitted).
“First, one of the exceptions listed in Article 404(B),” i.e., proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident, “must have some independent relevance, or be an element of the crime charged; in addition, such factors must be a genuinely contested issue at trial.” State v. Morgan, 45,110, p. 16 (La.App. 2 Cir. 4/14/10), 34 So.3d 1127, 1138. “Second, the state must make a showing of fact which would support a jury finding that the defendant committed the prior act by a preponderance of the evidence.” Id. “Third, even if independently relevant, the evidence may be excluded if its probative value is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.” Id.
“A trial court’s ruling on the admissibility of evidence pursuant to La. C.E. art. 404 B(l) will not be disturbed absent an abuse of discretion.” State v. Everett, 11-0714, p. 40 (La.App. 4 Cir. 6/13/12), 96 So.3d 605, 633.
In the present case, the State filed its notice of intent to offer other crimes evidence pursuant to La. C.E. arts. 412.2 and 404(B) on March 5, 2013. The notice informed Mr. Mark that the State intended to introduce evidence of Mr. Mark’s “1983 conviction (Case No. 298-818 D) for aggravated burglary of 2558 N. Rocheblave, belonging to N.R.” The notice relied on La. C.E. art. 412.2 for admission of evidence of a prior incident of “sexually assaultive behavior,” and La. C.E. art. 404(B) was mentioned once. The trial court excluded the State’s other crimes evidence under La. C.E. art. 404(B), but deemed the evidence admissible |⅞1 pursuant to La. C.E. art. 412.2. However, on the first day of trial, the trial court held a hearing in chambers for the purpose of hearing N.R.’s (the victim of the 1983 aggravated burglary) expected testimony in this trial. Thereafter, the trial court reversed its previous ruling and ruled the evidence of the 1983 aggravated burglary admissible pursuant to La. C.E. art. 404(B).
Contrary to Mr. Mark’s assertion that the notice was deficient because it did not contain the section of La. C.E. art. 404(B) relied upon by the State, La. C.E. art. 404(B) does not require that information to be set forth in the notice; it only need be provided upon request of the accused. See La. C.E. art. 404(B)(1); State v. Willis, 05-218, p. 35 (La.App. 3 Cir. 11/2/05), 915 So.2d 365, 390.
When identity is an issue, evidence of other crimes is admissible to *902 prove identity. State v. Phillips, 92-1063, p. 12 (La.App. 4 Cir. 2/29/96), 670 So.2d 588, 595; La. C.E. art. 404(B). Through the police report of the 1983 incident, the testimony of N.R., and Officer Jackson’s testimony that the fingerprints taken from Mr. Mark on the morning of trial and the fingerprints contained in the cert pack for Mr. Mark’s 1983 aggravated burglary matched, the State proved that Mr. Mark’s conviction for the 1983 offense was relevant to show his identity in the present case. The State offered additional proof of Mr. Mark’s identity in its notice of intent to introduce evidence of other crimes:
The defendant is charged with aggravated rape and aggravated kidnapping, which constitute crimes involving sexually assaultive behavior. The State intends to introduce evidence that the defendant was found guilty of aggravated burglary in 1983, wherein the defendant entered a female’s residence and attacked her from behind with a knife. The E.W. sustained bruising and lacerations as a result of the attack but was able to escape from the defendant. This conviction constitutes evidence of the accused’s commission of another crime, wrong, or act involving sexually assaul-tive behavior. In both crimes females are attacked. In both crimes the defendant’s choice of weapon is a knife. In both crimes, he approaches the females at their residences. In both crimes he attacks the females from behind at knife point. In both |22crimes, the women are left with lacerations and bruising caused by the attack. Both attacks occur within approximately four miles of each other.
Thus, while the notice did not specifically state “identity” as a ground for the admissibility of this evidence, the context of the notice showed that the purpose was to prove identity, a factor at issue in this case.
Furthermore, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The evidence at trial was presented in an orderly and clear manner: the State presented the testimony of E.W. before the evidence offered by N.R. The jury was not likely to be confused between the two different crimes, as both victims testified. Furthermore, the record reflects that N.R.’s testimony did not overwhelm or detract from E.W.’s evidence. Moreover, the trial court provided a limiting instruction to the jury regarding evidence of other crimes, thereby instructing the jury as to the proper consideration of such evidence. Accordingly, we find that the trial judge did not err in ruling the evidence was admissible pursuant to La. C.E. art. 404.
However, even if there was error, “the erroneous introduction of other crimes’ evidence is a trial error, i.e., an error which occurs during the case’s presentation to the trier of fact, which may be quantitatively assessed in the context of the other evidence” and is subject to harmless error review. Johnson, 94-1379, p. 15, 664 So.2d at 101. An error is harmless if it can be said “beyond a reasonable doubt that the guilty verdict was surely unattributable to the error.” State v. Robertson, 06-1537, p. 9 (La.1/16/08), 988 So.2d 166, 172. The present 12?,matter involves uncontroverted overwhelming DNA evidence. Therefore, Mr. Mark’s assertion lacks merit.

PREJUDICE OF PRIOR CONVICTION EVIDENCE

Mr. Mark contends that the evidence of his prior conviction for aggravated burglary prejudiced him in the eyes of the jury in that it served no other purpose than to *903 infer a propensity to commit criminal acts. Mr. Mark maintains that the 1983 conviction proved nothing as to his current charges and permitted the State to preju-dicially aver that he was a sexual predator.
Mr. Mark’s assertion is conelusory and lacks merit based on the reasons expounded above. Moreover, the evidence adduced was strong enough that the introduction of evidence of the 1983 crime did not contribute to the verdict.

MISTRIAL

Mr. Mark avers, pro se, that the trial court abused its discretion by denying his Motion for Mistrial based upon E.W.’s highly emotional state during her trial testimony.
“ ‘Mistrial is a drastic remedy that is only authorized where substantial prejudice will otherwise result to the defendant.’” State v. Adams, 07-0977, p. 5 (La.App. 4 Cir. 1/23/08), 976 So.2d 757, 760, quoting State v. Sartain, 98-0378, p. 10 (La.App. 4 Cir. 12/1/99), 746 So.2d 837, 845-46. “The determination of whether actual prejudice has occurred, and thus whether a mistrial is warranted, lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion.” State v. Wessinger, 98-1234, p. 24 (La.5/28/99), 736 So.2d 162, 183.
In the present case, as E.W. testified, she burst into tears and called to her sister, who was seated in the courtroom. The trial court judge called a recess and ^ushered E.W. into chambers. While in chambers, Mr. Mark’s counsel moved for a mistrial and/or requested that the trial court judge admonish the jury. The trial court judge denied both requests and noted for the record:
... any time we come into this building it is painful, it’s emotional. I am trying to limit it as much as I can. The jury is on break. The witness is on break. She has been instructed not to discuss her testimony with anyone and we’ll proceed forward.
“Courts have traditionally upheld denials of motions for mistrial based on emotional outbursts when a defendant fails to show their influence upon the jury prejudiced his right to a fair trial.” State v. Clark, 02-1463, p. 32 (La.6/27/03), 851 So.2d 1055, 1079 n. 25.
In Wessinger, during the penalty phase of trial, the murder victim’s mother burst into tears when the victim’s sweater was introduced into evidence, and the victim’s father shouted an expletive during the playing of the 911 tape. 98-1234, p. 24, 736 So.2d at 183. The defendant moved for a mistrial, which was denied. Id. On appeal, the Louisiana Supreme Court affirmed that denial, finding:
We cannot say that the trial judge abused his vast discretion in denying the mistrial at issue in this assignment of error. Defendant does not demonstrate, and we cannot ascertain from the record, how these outbursts could have prejudiced him to such a degree that a mistrial was warranted. Again, we must credit the jurors with the good sense and fair-mindedness to see these outbursts for what they were, the natural and irrelevant expression of human emotion, and not let the outbursts influence their decision on defendant’s penalty.

Id.

In State v. Domangue, 350 So.2d 599, 602 (La.1977), the Louisiana Supreme Court deemed a mistrial unnecessary when a rape victim’s spouse began crying during closing arguments. Likewise, in State v. Hopkins, 626 So.2d 820, 822-23 (La.App. 2 Cir.1993), the appellate court found that a mistrial was not warranted when the victim’s family cried during closing argu *904 ments, and the trial court later charged the jury not to be influenced by sympathy, passions, prejudice, or public opinion.
Mr. Mark has not demonstrated how the incidents prejudiced him to the point of warranting a mistrial. As noted in Wes-singer, “we must credit the jurors with the good sense and fair-mindedness to see these outbursts for what they were, the natural and irrelevant expression of human emotion.” 98-1234, p. 24, 736 So.2d at 183. To reinforce that the jurors should ignore E.W.’s outburst in the present case, the trial judge charged that they were “not to be influenced by mere sympathy, passion, prejudice or public opinion.” Thus, we find that the trial court did not abuse its discretion by denying Mr. Mark’s request for mistrial.

VALIDITY OF THE TEST METHODOLOGY

Mr. Mark alleges a claim of ineffective assistance of counsel in failing to object to the validity of the test methodology under a Daubert analysis, in failing to object to the chain of custody, and in failing to retain a DNA expert. Mr. Mark avers that the DNA testing procedures used in this case were questionable, and that there was no chain of custody established for the test results.
The issue of ineffective assistance of counsel is a matter more properly addressed in an application for post-conviction relief, filed in the trial court, where a full evidentiary hearing can be conducted. State v. Prudholm, 446 So.2d 729, 737 (La.1984). Only if the record discloses sufficient evidence to rule on the merits of the claim do the interests of judicial economy justify consideration of the issues on appeal. State v. Seiss, 428 So.2d 444, 449 (La.1983).
In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court of the United States articulated a two-part test for determining the effectiveness of a criminal defendant’s counsel. First, [t]his requires showing that counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment. Strickland, 466 U.S. at 687, 104 S.Ct. at 2064. “Second, the defendant must show that the deficient performance prejudiced his defense.” Id. “This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is rehable,” Id. “Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.” Id.
Louisiana courts have adopted the two-pronged test established in the Strickland case for determining the effectiveness of counsel. In State v. LaCaze, 99-0584, p. 20 (La.1/25/02), 824 So.2d 1063, 1078-79, quoting Strickland, 466 U.S. at 688, 104 S.Ct. 2052, the Louisiana Supreme Court discussed the effective assistance of counsel that a criminal defendant is afforded:
The Sixth Amendment does not guarantee “errorless counsel [or] counsel judged ineffective by hindsight,” but counsel reasonably likely to render effective assistance. Judicial scrutiny must be “highly deferential” and claims of ineffective assistance are to be assessed on the facts of the particular case as seen from “counsel’s perspective at the time,” hence, courts must indulge “a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance.”
“[H]indsight is not the proper perspective for judging the competence of counsel’s trial decisions.” State v. Brooks, 505 *905 So.2d 714, 724 (La.1987). “Neither may an attorney’s level of representation be determined by whether a particular strategy is successful.” Id. “If trial counsel’s actions fall within the |27ambit of trial strategy,’ they do not establish ineffective assistance of counsel.’ ” State v. Barnes, 12-1283, p. 19 (La.App. 4 Cir. 10/2/13), 126 So.3d 606, 617, quoting State v. Bienemy, 483 So.2d 1105, 1107 (La.App. 4th Cir.1986).
As to Mr. Mark’s claim that the DNA methodology employed by ReliaGene Technologies was “questionable,” he fails to identify any discrepancies or errors in the methodology used by ReliaGene. “General statements and conelusory allegations will not suffice to prove a claim of ineffective assistance of counsel.” State v. Celestine, 11-1403, p. 5 (La.App. 3 Cir. 5/30/12), 91 So.3d 573, 577. Moreover, the record does not reflect that the testing methodology was improper. Counsel for Mr. Mark cross-examined the State’s experts; however, the cross-examination did not reveal irregularities.
Next, Mr. Mark avers that the State failed to establish the chain of custody of the rape kit from the time the evidence was initially collected from E.W. to its transfer to ReliaGene. Mr. Mark asserts that by failing to establish a complete chain of custody for the DNA evidence, the State failed to prove that the DNA results were reliable.
This Court has set forth the appropriate standard of review when considering the claim of an alleged defect in the chain of custody:
[A] lack of positive identification or a defect in the chain of custody goes to the weight of the evidence rather than its admissibility. State v. Sam, 412 So.2d 1082, 1086 (La.1982); State v. Alexander, 621 So.2d 861, 864 (La.App. 5 Cir.), unit granted and case remanded for re-sentencing, 629 So.2d 376 (La.1993).
State v. Merrill, 94-0716, p. 9 (La.App. 4 Cir. 1/31/95), 650 So.2d 793, 799.
“To admit demonstrative evidence at trial, the law requires that the object be identified.” State v. Sweeney, 443 So.2d 522, 528 (La.1983). “It can also be |2sidentified by chain of custody, that is, by establishing the custody of the object from the time it was seized to the time it was offered in evidence.” Id. “The law does not require that the evidence as to custody eliminate all possibility that the object has been altered.” Id. “For admission, it suffices if the custodial evidence establishes that it is more probable than not that the object is the one connected with the case.” Id. “A preponderance of the evidence is sufficient.” Id. “A trial court has great discretion in determining whether a sufficient foundation has been laid for the introduction of evidence.” State v. Lewis, 97-2854, p. 31 (La.App. 4 Cir. 5/19/99), 736 So.2d 1004,1022.
To establish the chain of custody of the rape kit at trial, Dr. Friday testified that she performed the sexual assault examination on E.W. Dr. Friday took vaginal swabs and smears from E.W. and placed them in the rape kit, which was deposited in Charity Hospital’s secure refrigerated storage area. Detective Mercadel collected the sexual assault kit from Charity Hospital and deposited it into CEP, which preserved the rape kit according to departmental guidelines. Orleans Parish Coroner’s Office Serologist Ms. Daniels retrieved the rape kit from CEP the day after the rape and tested it at the NOPD crime lab. Her examination revealed the presence of semen and spermatozoa on E.W.’s vaginal smear. Ms. Daniels resealed the rape kit evidence, and it remained in the custody of the crime lab, which was accessible only by authorized personnel. *906 Eleven years after Ms. Daniels tested the rape kit, Ms. Montgomery reviewed the contents of the rape kit and sent them to ReliaGene for further analysis. Subsequently, Ms. Pineda, who was employed by ReliaGene, analyzed the rape kit and produced two genetic profiles — one belonging to E.W. and the other to an unknown male. ReliaGene then sent the rape kit and its report to Ms. Montgomery, who reviewed and Unconfirmed the results. Ms. Sehroe-der, an NOPD analyst, uploaded the DNA profiles from E.W.’s kit to CODIS. Detective Jarrott then received notice from the LSPCL of a DNA match between the sperm sample in E.W.’s rape kit and Mr. Mark’s CODIS profile.
It is more probable than not that the tested scientific evidence was connected to the present case. Additionally, there is no indication in the record of evidence tampering or that evidence was compromised. Furthermore, any defect in the chain of custody goes to the weight of the evidence, not its admissibility. For these reasons, counsel for Mr. Mark was not ineffective for failing to object to the chain of custody regarding the collection of evidence from E.W. through its testing at ReliaGene.
Mr. Mark contends that his trial counsel was ineffective for failing to retain a DNA expert. However, Mr. Mark makes conclusory allegations, which are insufficient to support a claim of ineffective assistance of counsel.
Nevertheless, “[effective counsel has been defined to mean not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance.” State v. Anderson, 97-2587, p. 7 (La.App. 4 Cir. 11/18/98), 728 So.2d 14, 19. Given that “ ‘opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel’s trial decisions.’ ” State v. Crowell, 99-2238, p. 8 (La.App. 4 Cir. 11/21/00), 773 So.2d 871, 878, quoting Brooks, 505 So.2d at 724. “ ‘Neither may an attorney’s level of representation be determined by whether a particular strategy is successful.’ ” Id. “[A] court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance.” Strickland, 466 U.S. at 689, 104 S.Ct. at 2065.
| qqMs. Montgomery testified extensively as to her professional credentials and her DNA testing proficiency, as well as the intricacies and protocols of DNA testing. However, Ms. Montgomery admitted that she did not test the samples from E.W.’s rape kit, thus suggesting to the jury that in spite of her involvement with the case and her detailed explanation of the test results, she did not personally test the biological material taken from E.W. or Mr. Mark. This could have been a trial strategy to negate the importance of Ms. Montgomery’s testimony in the eyes of the jury. Therefore, we find that Mr. Mark failed to carry his burden of proof to show that his trial counsel’s performance was deficient and that the deficiency prejudiced his case.

RIGHT TO CONFRONTATION

Mr. Mark avers that he was denied his constitutional rights to confront/cross examine the analysts who performed the DNA. He maintains that the testimony rendered by Ms. Montgomery, who played no part in the DNA testing, should have been excluded, and that the person(s) who did the actual testing should have testified.
In Bullcoming v. New Mexico, — U.S. —, —, 131 S.Ct. 2705, 2717, 180 L.Ed.2d 610 (2011), a progeny of Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme *907 Court held that a forensic DNA laboratory report containing a certification made for the purpose of proving a particular fact constituted testimonial hearsay. Thus, the Court held that the State’s introduction of such a certification through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification, violated the defendant’s rights under the Confrontation Clause. Bullcoming, — U.S. at —, 131 S.Ct. at 2710.
^Nevertheless, the United States Supreme Court rendered a decision in another Crawford progeny, Williams v. Illinois, — U.S. —, 132 S.Ct. 2221, 2228, 183 L.Ed.2d 89 (2012), involving a defendant identified as a suspect in a February 2000 rape case after an unknown male DNA profile derived from forensic evidence in the case was found to match the defendant’s known DNA profile derived from a blood sample obtained from him following his August 2000 arrest on an unrelated charge. At his trial, a DNA expert, who had no connection to the DNA testing actually performed in connection with the case, testified that the unknown male DNA profile produced by a private DNA lab, Cellmark, from vaginal swabs taken from the rape victim, matched the male DNA profile produced from the sample of the defendant’s blood. Williams, — U.S. at —, 132 S.Ct. at 2227. When Cellmark sent its DNA report to the state police lab, the defendant was not a suspect in the February 2000 rape case. Williams, — U.S. at —, 132 S.Ct. at 2229.
The United States Supreme Court framed the narrow issue presented in Williams as whether Crawford “bar[s] an expert from expressing an opinion based on facts about a case that have been made known to the expert but about which the expert is not competent to testify!.]” Williams, — U.S. at-, 132 S.Ct. at 2227. The Court held:
this form of expert testimony does not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted.... Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause.
Id., — U.S. at-, 132 S.Ct. at 2228.
IsaThe Louisiana Supreme Court interpreted and applied Williams, in State v. Bolden, 11-2435, pp. 3-4 (La.10/26/12), 108 So.3d 1159, 1161-62. Additionally, the Louisiana Supreme Court in Bolden further held that “as a matter of Louisiana law, the computer printouts of the profiles developed from the victims’ samples by the two laboratories using the same software did not constitute statements of a declar-ant for purposes of La.C.E. art. 801.” Id., 11-2435, p. 4,108 So.3d at 1162.
In the present case, the then unknown male DNA profile (later found to match Mr. Mark’s DNA profile) was developed by ReliaGene in March 2005 from vaginal swabs taken from E.W. in 1994. Mr. Mark was not a suspect in the case at that time.. He did not become a suspect until 2011, when a computer-generated hit in the CODIS database matched the DNA profile developed by ReliaGene with his known DNA profile that had been obtained after his arrest.
Under Williams and Bolden, any evidence introduced as to that CODIS match, whether it was the testimony of Ms. Montgomery or the actual computer-generated copy of the match, did not violate Mr. Mark’s rights under the Confrontation Clause. Pursuant to Williams, no one from ReliaGene had to testify concerning *908 its development of the DNA profile from the vaginal swabs taken from E.W. It was sufficient that Ms. Delatte, with the LSPCL, testified that a DNA profile of Mr. Mark, developed by the LSPCL from the reference buccal swabs obtained from him after his 2011 arrest in the instant case, matched the male DNA profile developed by ReliaGene in 2005. According to Williams, Mr. Mark was not denied any confrontation rights by the failure of any other technician from ReliaGene or the LSPCL to testify.

DECREE

For the above-mentioned reasons, we find that the trial court did not abuse |33its discretion in denying Mr. Mark’s Motion to Continue Trial, by admitting the evidence of his 1983 aggravated burglary conviction pursuant to La. C.E. art. 412.2 and art. 404(B), and the alleged prejudice of the evidence of his 1983 aggravated burglary conviction was outweighed by the probative value. Additionally, the trial court did not err in denying Mr. Mark’s request for a mistrial or in its holdings regarding the DNA evidence. Lastly, Mr. Mark was not denied the effective assistance of counsel. Therefore, we affirm Mr. Mark’s conviction and sentence.
CONVICTION AND SENTENCE AFFIRMED.
BELSOME, J., Concurs in the result.

. The victim is referred to by her initials to protect her privacy and assist in preventing public disclosure of her identity.

. The victim’s initials are utilized for confidentiality and to assist in preventing public disclosure of her identity.

. N.R.’s testimony, as the victim of Mr. Mark's 1983 aggravated burglary, was introduced as a portion of the State's Prieur evidence.

. Following a trial, Mr. Mark was found guilty of the 1983 aggravated burglary of N.R., case no. 298-818 D. Mr. Mark served ten years for the offense.

. The testimony referred to is N.R.’s testimony at the November 30, 1983, preliminary hearing in Mr. Mark’s aggravated burglary case.

. Mr. Mark fails to cite any of the alleged "numerous discrepancies.”