Judge Terri F. Love
| defendant Melvin Jones (“Mr. Jones”) appeals his conviction of felony carnal knowledge of a juvenile in violation of La, R.S. 14:80. Mr. Jones seeks reversal of his *130 conviction arguing that - material portions of the record bearing on the merits of his appeal are missing, he was unable to cross-examine the individuals who performed the DNA testing, and the trial court erred by admitting evidence of a 1998 allegation of aggravated rape. Although the record does not contain a compléte voir dire transcript, we find the omission is not so material as to prevent a full review: We also find the Confrontation Clause issue was not preserved for appellate review, and the trial court did not abuse its discretion by admitting evidence of'the 1998 alleged aggravated rape. Therefore, we affirm Mr. Jones’ conviction and sentence.

PROCEDURAL HISTORY AND FACTUAL BACKGROUND

In March 2014, Mr. Jones (a.k.a. Melvin Knight) was charged with one count of felony carnal knowledge of a juvenile. The factual background resulting in Mr. Jones’ conviction follows.
[ ¡>The victim S.H.[1] was born in 1984, When-S.H. was young, she suffered from depression after the death of her father and was later diagnosed with mild mental retardation. In 2000, S.H. was sixteen years old and lived in New Orleans with her mother (“J.H.”) and siblings. Testimony revealed that S.H. would occasionally run away from home. S.H. testified that on June 10, 2000, she ran away from home, but she left a note for her mother indicating that she was going to visit Sister Mitchell, a member of their church, at her house. While S.H. did visit Sister Mitchell that day, she proceeded to a friend’s house. Along the way, S.H. stopped to ask an unknown man for the time. S.H. testified that the man she spoke with was Mr. Jones, who asked S.H. to walk with him. Thirty minutes later, S.H. and Mr. Jones arrived at Mr. Jones’ house. Mr. Jones locked the front door and forced S.H. onto the couch and proceeded to have sex with her.
S.H.’s mother J.H. did not know her daughter ran away until she called Sister Mitchell and learned that S.H. had not been seen since she left Sister Mithcell’s house. Concerned, J.H. contacted the police. J.H. subsequently received a phone call regarding S.H.’s whereabouts. The police then escorted J.H. to the house where S.H. was,located. J.H. testified that she found her daughter S.H. disheveled, distraught, crying, and disoriented.
Initially, S.H. told her mother and the police that nothing happened to her because she was afraid of what Mr. Jones might do to her. However, when she | ¡¡was transported to the hospital for observation and examination, S.H. admitted to the nurse that she recently had sexual intercourse. S.H. underwent a pelvic examination, and her mouth and vaginal area were swabbed.
At trial, S.H. testified that she could not remember whether she had consensual sex with a man named Melvin Jones or Melvin Knight. She also stated that at the time of the incident she was not sexually active. On cross-examination, S.H. explained that the reason she fold the police she did not have sex was because she feared Mr. Jones. However, she did ultimately admit to her mother and the police she was raped but did not know by whom.
The original investigation in 2000 did not lead to any arrests. However, the NOPD contracted with Reliagene Technologies to process a backlog of rape kits, including the rape kit performed on S.H. in June *131 2000, identified as NOPD Item Number F19801-2000. Ms. Gina Pineda (“Ms. Pine-da”) testified as an expert in the field of molecular biology and DNA analysis. Under Ms. Pineda’s supervision, Reliagene processed and tested NOPD Item Number F19801-2000. The kit contained two items for testing including the victim’s blood sample and a vaginal swab. Ms. Pineda testified that she did not conduct the actual testing in this case, but rather reviewed the testing protocol and interpreted the results. From the results, Ms. Pineda concluded that NOPD Item Number F19801-2000 presented DNA of the victim S.H. and the DNA of a male donor.
Over defense’s objection, the State sought to call as a witness S.T., the victim of an alleged sexual assault that occurred in 1998. The trial court allowed |4S.T. to testify. S.T. testified that in 1998 she was fourteen or fifteen years old and living in New Orleans. She related to the jury an incident that occurred in July 1998 while walking home from a friend’s house. She stated that she was approached by a man, who was wearing a Sears uniform and driving a white Sears van. The man spoke to S.T. about helping her get a job. He told her that he had a job application at home and would give it to her if she would accompany him to his apartment. S.T. agreed.
At the apartment, S.T. remained in the front room while the man entered the kitchen to retrieve the application. However, the man returned with a butcher knife and ordered S.T. to disrobe. She complied with his demand but begged him not to hurt her. According to S.T., the man led her to a bedroom where he raped' her. S.T. testified that during the attack her assailant had put the knife down and she attempted to grab it. S.T. testified that she grabbed the knife by the blade and her hand was sliced when her assailant pulled the knife away from her. She stated that the attack lasted approximately forty-five minutes, after which he - gathered the bloody sheets-and they left his apartment. S.T.’s attacker' threw the sheets in a dumpster near his, apartment and drove S.T. around, asking if she was going to tell anyone what happened. When she convinced him she would not tell anyone, he released her. S.T. fled from the van and found her friends, who transported her to the hospital where she underwent a rape examination.,
S.T. testified that she did not know the man who attacked her. In 2012, S.T. was contacted by a detective, who informed her that an arrest was made in relation | fito her assault.
In addition to processing the rape kit in S.H.’s case, Reliagene also processed the rape kit in S.T.’s case, identified as NOPD Item Number G10251-1998. Ms. Pineda testified that the results from the sample-matched the DNA of S.T. and tested positive for the presence of seminal fluid of a male donor,, from which a profile was generated. Ms. Pineda testified that a comparison of the test results from NOPD Itetai Number F19801-2000 and NOPD Item Number G10251-1998 indicated that the sperm profiles in- the two cases matched. The evidence was then returned to NOPD for its review of Reliagene’s work to ensure accuracy of -the results and to upload the results to the National DNA Database (CODIS).
In December 2011, NOPD Sex Crimes Unit received two CODIS match notification letters as to the sexual assault cases involving S.T. in 1998 and S.H. in 2000. Thereafter, Sergeant James Kelly (“Sergeant Kelly”) reviewed the case files, located each victim, and interviewed them. Neither -victim knew Mr. Jones. Based upon the DNA match, Sergeant Kelly obtained an arrest warrant for Mr. Jones. Sergeant *132 Kelly testified that he interviewed Mr. Jones, who denied having sex with the victims. He stated that Mr. Jones admitted to him that he drove his employer’s white van in 1998. Sergeant Kelly placed Mr. Jones under arrest and obtained a search warrant to obtain a buccal swab from Mr. Jones.
At trial, the State also called as' a witness Anne Montgomery (“Ms. Montgomery”), co-founder of Reliagene and an expert in the field of molecular biology and forensic DNA analysis, whose testimony corroborated Ms. Pineda’d f> testimony regarding Reliagene’s test results. Julia Naylor Kirks (“Ms. -Kirks”), a forensic scientist with the Louisiana State Police Crime Lab and expert in the field of forensic DNA analysis and microbiology, was also called as a witness. Ms. Kirks testified that she received a request to compare the genetic profile obtained from a buccal swab of Mr. Jones to the sperm donor DNA profiles generated by Reliagene in NOPD Item Numbers F19801-2000 and G10251-1998. She concluded that the statistical probability that the sperm donor DNA profile developed in the 2000 and 1998 cases belonged to anyone other than Mr. Jones was one in 141 quadrillion.
Following two days of testimony, the case was submitted to the jury, who found Mr. Jones guilty as charged. Mr. Jones filed motions for new trial and post-verdict judgment of acquittal, which the trial court denied. Mr. Jones was sentenced to ten years with credit for time served.[2] Thereafter, the State filed a multiple bill charging Mr. Jones as a triple felony offender to which Mr. Jones pled guilty. The trial court vacated the original sentence and sentenced Mr. Jones pursuant to the multiple bill to eighteen years with credit for time served. The trial court then granted Mr. Jones’ motion for appeal. Mr. Jones timely seeks appellate review of his conviction and sentence.

INCOMPLETE RECORD

In his first assigned error, Mr. Jones argues that his conviction must be reversed because the record does not contain a complete voir dire transcript, and as |7a result he is deprived of his right to a full judicial review. The portions of the voir dire that are transcribed concern objections during the panel questioning. However, the portions pertaining to peremptory and cause challenges are not included, making it impossible, Mr. Jones argues, to review the viability of the challenges for cause.
La. Const. art. I § 19 guarantees defendants a right of appeal “based upon a complete record of all the evidence upon which the judgment is based.” Additionally, La. C.Cr.P. art. 843 provides in pertinent part:
In felony cases,[... ] the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel.
Nonetheless, an incomplete record may be adequate for full appellate review. State v. Thomas, 92-1428, 93-2083 (La. App. 4 Cir. 5/26/94), 637 So.2d 1272, 1274.
The Louisiana Supreme Court enunciated a three-part standard for reviewing incomplete record claims. State v. Frank, 99-0553, p. 20-21 (La. 1/14/01), 803 So.2d 1, 19-20. First, “[m]aterial omissions *133 from the transcript of the proceedings at trial bearing on the merits of an appeal will require reversal.” Id., 99-0553, p. 20-21, 803 So.2d at 19-20 (citing State v. Robinson, 387 So.2d 1143 (La. 1980) (finding omissions material as substantial portions of the record were missing, including the testimony of four state witnesses, voir dire examination of prospective jurors, and the prosecutor’s opening statements)); See also State v. Diggs, 93-0324 (La.App. 4 Cir. 6/29/95), 657 So.2d 1104 (finding unavailability of witness testimony required a new trial because it could not be determined | «whether the missing testimony was substantial or inconsequential).
Second, “inconsequential omissions or slight inaccuracies do not require reversal.” Frank, 99-0553, p. 21, 803 So.2d at 20 (citing State v. Goodbier, 367 So.2d 356, 357 (La. 1979) (declining to reverse when record did not include voir dire examination transcript and the court reporter’s affidavit indicated that no objections were made by the attorneys during voir dire); See also State v. Lyons, 597 So.2d 593 (La. App. 4th Cir. 1992).
Third, “a defendant is not entitled to relief because of an incomplete record absent a showing of prejudice based on the missing portions of the transcripts. Frank, 99-0553, p. 21, 803 So.2d at 20 (citing State v. Castleberry, 98-1388, p. 29 (La. 4/13/99), 758 So.2d 749, 773). “Prejudice is presumed when a defendant’s challenge for cause is erroneously denied by a trial court and that defendant exhausts his peremptory challenges.” State v. Thomas, 14-0510, p. 17 (La.App. 4 Cir. 5/20/15), 171 So.3d 959, 971 (citing State v. Odenbaugh, 10-0268, p. 24 (La. 12/6/11), 82 So.3d 215, 237).
In State v. Pinion, 06-2346 (La. 10/26/07), 968 So.2d 131, the record contained neither a transcript of the bench conferences nor any documentation showing which jurors were challenged for cause by the defense or stricken by the defense with peremptory challenges. The Louisiana Supreme Court found that although there was evidence that the defense exhausted its peremptory challenges, the lack of any such documentation as to the challenges for cause prejudiced the defendant. Id., 06-2346, p. 9, 968 So.2d at 136. Therefore, it reversed the defendant’s conviction and sentence for lack of documents in the record which would have indicated whether the trial court correctly denied any challenges for cause. Id.
|flHere, the court reporter who transcribed the proceedings filed a Certificate of Unavailability of Transcripts, attesting that no paper tapes or recordings of the trial court could be found, and that while the trial transcript and some portions of the voir dire were available, “an entire transcript of the voir dire cannot be produced ... as nothing can be located regarding this transcript.” The December 9, 2014 minute entry, on the other hand, indicates seven jurors were excused by the defense, three by the State, and seven for cause.
Mr. Jones notes that both he and the State were allowed six peremptory challenges for the jury pursuant to La. C.Cr.P. art. 799 and an additional challenge for the alternate juror. In that Mr. Jones used all of his peremptory challenges, Mr. Jones contends that if one of his challenges for cause were erroneously denied by the trial court, he would be entitled to a new trial. Therefore, Mr. Jones asserts that a complete transcript of the voir dire proceedings is vital to appellate review.
The portions of the voir dire transcript contained in the record do not indicate that the defense lodged any objections during voir dire. Absent a contemporaneous objection, an appellate court may only review *134 those errors which are discoverable by mere inspection of the pleadings and proceedings. La. C.Cr,P. art. 920.
Although neither the minute entries nor the transcript indicate how many challenges for cause were denied or which party requested them, the trial judge’s jury strike sheet is contained in the record. Review of the strike sheet indicates that the trial court granted the State’s challenges for cause as to jurors 7, 8, and 10. The trial court also granted Mr. Jones’ challenges for cause as to jurors 12, 20, 22, and 23. The notes contained on the strike sheet also indicate that the defense challenged for cause jurors 5, 9,11, and 17, but the trial court denied those |inchallenges. There is no information as to the basis of Mr. Jones’ challenges for cause which the trial court denied. Even so, the strike sheet reveals that Mr. Jones exercised peremptory challenges as to those jurors when the challenges for cause were denied.
Mr. Jones contends that without a complete voir dire transcript the possibility exists that -the trial court erroneously denied at least one of his cause challenges; therefore, this Court should reverse the jury’s verdict. Like Pinion, the relevant portions of the voir dire transcript are missing. However, the Pinion court reversed the defendant’s conviction not only because of the missing transcript but also because of “the uncertainty with respect to how many cause challenges the defense made unsuccessfully, and the absence of other contemporaneous records accounting for the selection ’ process, e.g., adequate minutes or jury strike sheets Pinion, 06-2346, p. 9, 968 So.2d 131, 136. This case is distinguishable because contained in the record- is the minute entry of the selection process and the trial court’s jury strike sheet that documents which jurors were challenged for cause by the defense or stricken by the defense with peremptory challenges. See Id., 06-2346, p. 7-8, 968 So.2d at 134-35 (“[T]he failure to record bench conferences will ordinarily not affect the direct review process when the record suggests that the unrecorded bench conferences had no discernible impact on the proceedings and did not result in any specific prejudice to the defendant.”) (citing State v. Hoffman, 98-3118, p. 50-51 (La. 4/11/00), 768 So.2d 542, 587)).
Mr. Jones only raised cause challenges for eight prospective jurors, of which the trial court granted four. Of the remaining cause challenges, Mr. Jones used his peremptory challenges to strike those jurors from the venire. Not a single juror that Mr. Jones challenged in this case became a part of the impaneled jury. |nInstead, the jury was composed of only those jurors to whom Mr. Jones had no objection. Moreover, Mr. Jones does not complain on appeal that the impaneled jury was anything less than impartial. Therefore, Mr. Jones has not shown any prejudice that has resulted from the missing portions of the transcript. Unlike Pinion, we find the omission in this case is not so material as to prevent this Court from conducting a full- review where the omission has no discernible impact and did not result in specific prejudice to Mr. Jones.

CONFRONTATION OF WITNESSES

Mr. Jones asserts in his second assigned error that his Sixth Amendment right to confront the witnesses against him was violated because the Reliagene personnel that performed the DNA testing and analysis did not testify at trial.
Mr. Jones filed a motion in limine to exclude the DNA analysis performed by Reliagene, “unless the prosecution calls the lab tech, who. performed the analysis, to testify.” The trial court did not rule on the motion prior to the commencement of trial. Likewise, there is no evidence that *135 Mr. Jones re-urged the motion or objected to the trial court’s failure to consider the issue prior to the start of trial. Further, Mr. Jones did not lodge a contemporaneous objection at trial during the testimony of the. State’s DNA experts or the -introduction of the Reliagene DNA testing analysis. See La. C.Cr.P. art. 841. Therefore, the assigned error has not been preserved for appellate review, Even if the issue were preserved for. appellate review, the argument lacks merit.
In Bullcoming v. New Mexico, 564 U.S. 647, 181 S.Ct. 2705, 180 L.Ed.2d 610 (2011), the defendant’s aggravated driving while intoxicated conviction was based primarily on a forensic laboratory report which certified that his blood-alcohol concentration was above the legal limit. The analyst who signed the report | ^.certification did not testify at trial. The State called another analyst familiar with the laboratory’s procedures to testify instead. The Buttcoming court found the report could only be used against the defendant if the defendant had an opportunity to confront at trial the analyst who performed, observed, or supervised the forensic examination. The Coürt noted that the Sixth Amendment was not satisfied by the “surrogate” witness who was familiar with the laboratory’s practices but who had formed no independent opinion concerning the forensic examination results. Id., 564 U.S. at 661-62, 131 S.Ct. at 2715-16. The key question in Confrontation Clause cases is whether the evidence sought to be admitted is testimonial in nature: “As a rule, if an out-of-court statement is testimonial in nature, it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness.” Id., 564 U.S. at 657, 131 S.Ct. at 2713.
By contrast, in Williams v. Illinois, 567 U.S. 50, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), the Supreme Court held that the Confrontation Clause was not violated when the state’s DNA expert testified on the basis of a report by another DNA expert, who did not testify at trial, that the DNA profile of a blood sample taken from the defendant matched the DNA profile taken from the biological traces found on the victim of a sexual assault. Two reasons for the Court’s finding were offered. First, the expert’s reliance on the report was not offered to prove' the truth of the matter asserted because the results of the DNA test were' relayed by the expert solely for the purposé of explaining the assumptions on which his opinion rested. Id., 567 U.S. at 55-59, 132 S.Ct. at 2227-28. Second, the DNA profile’ was produced before the defendant was identified as a suspect and was not inherently inculpatory. Id., 567 U.S. at 57-59, 132 S.Ct. at 2228. The Court reasoned that the ^report was different from the extrajudicial statements the Sixth Amendment was originally intended to reach. The Court explained:
The report was produced before any suspect was identified. The report was sought not for the purpose of obtaining evidence to be used against the petitioner, who was not even under suspicion at the time, but for the purpose of finding a 'rapist who was on the loose. And the profile that Cellmark provided was not inherently inculpatory. On the contrary, a DNA profile is evidence that tends to exculpate all but one of the more than 7 billion people in the world today. The use of DNA evidence to-exonerate persons who have been wrongfully accused or convicted is well known. If DNA profiles could not be introduced without calling the technicians who participated in the preparation of the profile, economic pressures would encourage proser eutors to forgo DNA testing and rely *136 instead on older forms of evidence, such as eyewitness identification, that are less reliable. [... The Court’s] conclusion will not prejudice any defendant who really wishes to probe the reliability of the DNA testing [... ] because those who participated in the testing may always be subpoenaed by the defense and questioned at trial.

Id.

This Court considered Bullcoming and Williams in State v. Grimes, 11-0984 (La. App. 4 Cir. 2/20/13), 109 So.3d 1007, where the defendant was convicted of aggravated rape, aggravated kidnapping, and sexual battery of two victims in 1993 and 1997. At the time of the attacks, the perpetrator was unknown, although DNA analysis of the sexual assault kits identified the defendant as the perpetrator in 2005. Citing Williams, this Court stated, “even if forensic DNA reports are admitted in evidence without in-court testimony of the scientist/analyst who signed the certification or performed or observed the test reported in the certification [... ] generally, there is no Sixth Amendment Confrontation Clause violation because the reports are not testimonial.” Id., 11-0984, p. 28-29, 109 So.3d at 1023 (emphasis in original); See also State v. Bolden, 11-2435, p. 4 (La. 10/26/12), 108 So.3d 1159, 1161-62 (finding no Confrontation Clause violation if “the tests on the victim’s samples were conducted before the defendant was identified as the | ^assailant or targeted as a suspect.”).
Further, the Louisiana Supreme Court stated that as a matter of state law the computer generated statements (i.e. printouts of the DNA profiles that are developed) “did not constitute statements of a declarant for purposes of La. C.E. art. 801 (defining a statement as an oral or written assertion by a declarant, or ‘person who makes a statement’).” Id., 11-2435, p. 5, 108 So.3d at 62.
Applying this analysis, the State’s expert witnesses’ testimony and the DNA report generated by Reliagene do not constitute testimonial evidence. Therefore, the expert testimony does not violate the Confrontation Clause because “[o]ut-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause.” Williams, 567 U.S. at 58, 132 S.Ct. at 2228. Additionally, neither DNA report was prepared for the primary purpose of accusing Mr. Jones as a suspect in the sexual assaults. The tests of the victims’ samples were extracted in 1998 and 2000, and uploaded into the State’s CODIS database in 2003, well before the 2012 computer-generated CODIS match identified Mr. Jones as the assailant or targeted him as a suspect in the cases. The primary purpose of the testing was not to target a specific or known suspect, as noted in Bullcoming, but rather to catch an unknown sex offender. Cf. Williams, 567 U.S. at 92-95, 132 S.Ct. at 2248-49.

PRIEVR EVIDENCE

In his third assigned error, Mr. Jones claims the trial court erred by allowing the admission of other crimes evidence. “A trial court’s ruling on the admissibility of evidence of other crimes will not be overturned absent an abuse of discretion,” State v. Mark, 13-1110, p. 16 (La.App. 4 Cir. 7/30/14), 146 So.3d 886, 899 (citing State v. Wright, 11-0141, p. 10-11 (La. 12/6/11), 79 So.3d 309, 316).
Courts may not admit evidence of other crimes to show the defendant as a man of bad character who has acted in conformity with his bad character. La. C.E. art. 404(B)(1). Evidence of other crimes, wrongs or acts committed by the *137 defendant is generally inadmissible because of the “substantial risk of grave prejudice to the defendant.” State v. Prieur, 277 So.2d 126, 128 (La. 1973). However, the State may introduce evidence of other crimes, wrongs or acts if. it establishes an independent and relevant reason such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. La. C.E. art. 404(B)(1). Even when the other crimes evidence is offered for a purpose allowed under art. 404(B)(1), the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defendant’s defense. State v. Martin, 377 So.2d 259, 263 (La. 1979); Prieur, 277 So.2d at 130.
“Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.” La. C.E. art. 403. In this case, the probative value of the other crimes evidence was not substantially outweighed by unfair prejudice, confusion, undue delay, or waste of time. Prior to trial, the trial judge questioned the victim of the 1998 incident to test the admissibility of the evidence to be offered at trial. When the victim testified at trial, she was the first witness, and given her testimony was no more than ten pages in length, it was not so time-consuming as to risk distracting the jury from the charges at issue at the trial. The evidence was presented in a clear, orderly manner, and the witness was subject to cross-examination, during which the prosecutor and defense counsel showed the jury that the evidence of the 1998 incident was not |1firelated to the instant case.
Likewise, there was no showing that the jury was misled or confused by the presentation of the other sexual crime evidence. At the beginning of voir dire, the trial court read the indictment to the potential jurors and instructed them it was the State’s burden to prove only the charged offense, carnal knowledge of a juvenile, which it also defined for the jurors. Therefore, we find no error of the trial court by allowing the State to present the other crimes evidence because the probative value of the 1998 sexual offense evidence was not substantially outweighed by the danger of unfair prejudice.
In addition, to the extent that the State proved Mr. Jones’ identity based on the DNA evidence and that consent was not a defense to the charge, evidence of the unrelated sexual assault had no effect on the jury’s verdict. Thus, even if the admission was erroneous, the error was harmless. Mark, 13-1110, p. 22, 146 So.3d at 902 (“An error is harmless if it can be said beyond a reasonable doubt that the guilty verdict was surely unattributable to the error.”) (internal quotations omitted).

DECREE

Although portions of the voir dire transcript are missing from the record, we find the minute entry and the jury strike sheet offer sufficient documentation to provide a full review of Mr. Jones’ conviction and sentence. In that the impaneled jury consisted of only those jurors to whom Mr. Jones had no objection and the DNA evidence established that the statistical probability that the sperm donor DNA profile developed by Reliagene matched anyone other than Mr. Jones was one in 141 quadrillion, we find Mr. Jones has not shown any prejudice resulting from the incomplete record. We affirm Mr. Jones’ conviction and sentence.
AFFIRMED

. Initials of the victims and their family members are used throughout this opinion pursuant to La. R.S. 46:1844(W), which bars the disclosure of the names, addresses, or identities of crime victims under the age of eighteen and of all victims of sex offenses.

. At the time of the offense in 2000, La. R.S. 14:80 was not defined as a crime of violence under La. R.S. 14:2 and carried a minimum sentence of six years and eight months and a maximum sentence of twenty years.